**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

OLGA LAVANDEIRA,

    Plaintiff,

vs.                                                                                   CASE NO.:

TAMPA POLICE DEPARTMENT, BRIAN DUGAN *in his official capacity as* Chief of the Tampa Police Department, THIRTEENTH JUDICIAL CIRCUIT COURTHOUSE, OFFICE OF THE STATE ATTORNEY THIRTEENTH JUDICIAL CIRCUIT, and ANDREW H. WARREN *in his official capacity as* State Attorney for the Thirteenth Judicial Circuit,

    Defendants.

_____/

**COMPLAINT
DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiff, OLGA LAVANDEIRA, by and through her attorney, brings this lawsuit seeking injunctive and declaratory relief, and monetary damages against the TAMPA POLICE DEPARTMENT, BRIAN DUGAN *in his official capacity as* Chief of the Tampa Police Department, THIRTEEN JUDICIAL CIRCUIT COURTHOUSE, OFFICE OF THE STATE ATTORNEY THIRTEENTH JUDICIAL CIRCUIT, and ANDREW H. WARREN *in his official capacity as* State Attorney for the Thirteenth Judicial Circuit (collectively, "The Defendants") for violations of Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). Defendants failed to provide effective communication, auxiliary aids and services, meaningful access, and denied Plaintiff full and

equal enjoyment of Defendants' services, facilities, and privileges. Defendants also failed to make reasonable modifications in policies, practices, procedures, and failed to train personnel to work effectively with deaf citizens.

## INTRODUCTION

From October 2017 to November 2017, four (4) people were alleged to have been murdered by Howell Donaldson ("Donaldson"), a/k/a The Seminole Heights Serial Killer.[1] Ms. Lavandeira is the mother of the second murder victim, Monica Hoffa ("Monica"). Monica was murdered on October 11, 2017, she was only thirty-two (32) years old, and was the only daughter of Ms. Lavandeira. Ms. Lavandeira is deaf, and uses American Sign Language ("ASL") to communicate effectively. Throughout her daughter's murder investigation, meetings with the prosecutor's office, meetings with the detectives from TPD, meetings with the victim's advocate, and court hearings, the Defendants failed to provide sign language interpreters and meaningful access to Ms. Lavandeira. Ms. Lavandeira and her family members made repeated requests for interpreters, but the Defendants were defiant in their ongoing exclusion. Upon the murder of her only child, Ms. Lavandeira was plunged into a legal system obligated to include her, but instead was shut out as she desperately tried to find out how her child was found murdered in a vacant lot.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the actions pursuant to 28 U.S.C. §§ 1331, 1343, for the Plaintiff's claims arising under the ADA and Section 504.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) -

---

[1] As of the filing date of the Complaint, Donaldson has not yet been convicted of the four (4) murders.

(b)(2) because, (1) the Defendants are located in this district, and or (2) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and are occurring within this district.

## PARTIES

### PLAINTIFF

3. Plaintiff, Olga Lavandeira ("Ms. Lavandeira"), is and was, at all times relevant, a resident of Hillsborough County, Florida. Ms. Lavandeira is deaf, she cannot speak clearly, and uses American Sign Language ("ASL") to communicate. She is a qualified individual pursuant to the ADA and Section 504.

### DEFENDANTS

4. Defendant, TAMPA POLICE DEPARTMENT ("TPD") is comprised of Homicide Investigation, Patrol Operations, Crime Prevention, and other units, and is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1).

5. Defendant, BRIAN DUGAN *in his official capacity as* Chief of the Tampa Police Department, has statutory authority to implement the relief sought in this Complaint, and is a public entity within the meaning of 42 U.S.C. § 12131(1).

6. The THIRTEENTH JUDICIAL CIRCUIT COURTHOUSE, is located in Hillsborough County, Florida, and is a public entity within the meaning of 42 U.S.C. § 12131(1).

7. The OFFICE OF THE STATE ATTORNEY THIRTEENTH JUDICIAL CIRCUIT, is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1).

8. ANDREW H. WARREN *in his official capacity* as State Attorney for the Thirteenth Judicial Circuit, has statutory authority to implement the relief sought in this Complaint, and is a public entity within the meaning of 42 U.S.C. § 12131(1).

9. All Defendants receive federal financial assistance within the meaning of the Section 504 of Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

## FACTUAL ALLEGATIONS

10. Ms. Lavandeira is the mother of Monica Hoffa who was murdered on October 11, 2017, and her body was found on October 13, 2017, in a vacant, overgrown lot in Tampa, Florida.

11. Ms. Lavandeira is deaf, and uses American Sign Language ("ASL") to communicate effectively. She was born deaf in Cuba, and raised in a household where the primary language spoken was Spanish. Ms. Lavandeira cannot speak clearly, and cannot lip-read.

12. According to records obtained through a public records request, after TPD found Monica's body, the TPD went to Monica's apartment at least two (2) times. The first time, Detective Austin Hill and another officer went to Monica's home, they found Monica's *deaf* roommate home, she was alone and she uses ASL to communicate. Tampa Police Department and Brian Dugan *in his official capacity as* Chief of the Tampa Police Department (hereinafter collectively "TPD"), used the services of the Video Relay Service (VRS)[2] to interview the deaf roommate.

---

[2] VRS is a free service which enables a deaf or hard of hearing person to make and receive telephone calls through a communications assistant (CA) who is a qualified ASL interpreter via videophone, computer, or cell phone.

13. TPD knew the roommate was deaf, used ASL, and required interpreting services because they used VRS to interview her on their <u>first</u> visit.

14. On information and belief, after the first visit, TPD was called and asked to return to Monica's apartment a <u>second</u> time, with a request to speak to Monica's grandparents and her boyfriend. Later that day, Detective Hill and another detective returned to Monica's apartment, however, they did not bring an ASL interpreter, or use an interpreter through VRS. Present at this meeting were Ms. Lavandeira's parents (who speak Spanish), Monica's *deaf* roommate (who communicates in ASL), Ms. Lavandeira's niece Yurian Gutierrez and her husband, and Monica's boyfriend. Ms. Lavandeira was not present at this meeting.

15. The TPD used the Plaintiff's niece, Yurian Gutierrez, as a Spanish interpreter for Plaintiff's parents, while concurrently requiring her to act as the sign language interpreter for Monica's deaf roommate. Yurian Gutierrez is not a qualified ASL interpreter, and she was also a grieving family member, struggling to understand what happened to Monica.

16. During this meeting, TPD told the family of Monica's death and other investigative items. Knowing Plaintiff was deaf, and the predicted need to communicate with the TPD, the family members told TPD that Monica's mother, the Plaintiff, was deaf, and required an ASL interpreter.

17. Upon Plaintiff's arrival in Tampa, on October 13, 2017, Ms. Lavandeira's family told her Monica had been murdered, and her body was found in a vacant lot.[3]

---

[3] After Monica was murdered, Anthony Naiboa was murdered on October 19, 2017, and Ronald Felton was murdered on November 14, 2017. They are believed to be the third and fourth victims of the Seminole Heights Serial Killer.

18. Prior to preparing for Monica's funeral, Ms. Lavandeira contacted the TPD to collect Monica's jewelry. On approximately October 20, 2017, Ms. Lavandeira was told to come to the police station. During that call, TPD was reminded that Ms. Lavandeira was deaf, and needed an ASL interpreter.

19. Plaintiff went to TPD and spoke to Detective Hill to retrieve Monica's personal belongings. Although they told Ms. Lavandeira to come to the station, when she arrived, no interpreter was provided either on-site or through video remote interpreting (VRI)[4] through a computer.

20. The Plaintiff came to TPD with another niece, who can hear and speak, and like Mrs. Yurian Gutierrez, she was not a qualified interpreter. Ms. Lavandeira was forced to use her niece as an interpreter, but her niece only knows some rudimentary fingerspelling.[5] This was not effective, and Ms. Lavandeira was forced to attempt to communicate by paper and pen, and that too was ineffective.

21. Ms. Lavandeira had many questions she wanted to ask the TPD about her daughter's death, and about some of Monica's property which the TPD refused to return. Ms. Lavandeira was unable to engage in an interactive exchange of information regarding Monica's murder, and was deprived of the opportunity to inquire further.

22. At that time, now approximately one week after Monica's murder, the only information Ms. Lavandeira had about her daughter's death was by way of what her family members told her, or what she learned by watching the news on TV (when the information

---

[4] Video Remote Interpreting (VRI) is a paid for service that can be remotely used from a computer, iPad, or, in cases of urgent need, a cell phone. VRI differs from VRS because VRS is to be used exclusively to place and receive phone calls.
[5] Fingerspelling consists of spelling out a word, one letter at a time.

broadcasted on TV was captioned). At that time, it was her understanding that Monica had been shot five (5) times, with several shots to the face.

23. From this point on, TPD failed to contact Ms. Lavandeira directly, and, instead, used hearing family members as a conduit, specifically Monica's estranged biological father. TPD's failure to communicate with Ms. Lavandeira resulted in her always receiving second hand information, censored and delayed, and denied her the ability to engage in an interactive exchange of information with TPD. The ongoing exclusion of Ms. Lavandeira created an unnecessary and stressful reliance on family members to learn of the circumstances related to Monica's murder and the investigation thereof.

24. On information and belief, there are at least six (6) ASL Interpreter Referral Agencies serving the Tampa area, which can provide both on-site interpreters and interpreters through VRI.

25. On approximately November 7, 2017, a meeting was scheduled for Ms. Lavandeira, her parents, and other family members to meet with the Hillsborough County Victim Assistance Program ("VAP")[6] (hereinafter collectively, Office of the State Attorney Thirteenth Judicial Circuit, and Andrew H. Warren *in his official capacity* as State Attorney for the Thirteenth Judicial Circuit, "SAO") to discuss the case. Ms. Lavandeira and her family members requested an ASL interpreter for the meeting, but the request was denied.

26. The family was told the purpose of the meeting was to discuss the case, comfort the grieving family, and offer assistance. As a result of the SAO's failure to secure an ASL interpreter, Mrs. Gutierrez was forced to attempt to interpret in both Spanish for Monica's

---

[6] The Victim Assistance Program is under the auspices of the Office of the State Attorney 13th Judicial Circuit.

grandparents, then in ASL for Ms. Lavandeira. This was completely ineffective, extremely upsetting, and brazenly cruel to Ms. Lavandeira who was left out of the meeting.

27.     On November 28, 2017, Donaldson was arrested by the TPD, and charged with the murder of the four (4) victims to include Monica. Instead of informing Ms. Lavandeira of the arrest, as she had requested, TPD contacted Ms. Lavandeira's estranged husband. Ms. Lavandeira found out through a text message from a family member.

28.     On November 28, 2017, TPD held a press conference about the arrest of Donaldson. TPD used a "fake" sign language interpreter at the press conference. This imposter held no interpreting credentials, and, in fact, was not even an interpreter but was, instead, simply an individual who managed to make her way next to Chief Dugan, and "interpreted" for the Deaf Community so they would be aware of Donaldson's arrest. Ms. Lavandeira and the Deaf community were outraged by TPD's callous lack of regard for deaf citizens' safety. This incident was widely reported by the news and on social media. As a result, the Plaintiff continued to be denied meaningful access to information about her daughter's murder.

29.     Donaldson's First Appearance was scheduled at the Thirteenth Judicial Circuit Courthouse (hereinafter the "13th Judicial Courthouse") on November 29, 2017.  Ms. Lavandeira was contacted by Jo Carroll of the Victim Assistance Program by way of text message, and she was text messaged because she was deaf. A request was made for an ASL interpreter for the court hearing.  The request was denied, and Ms. Lavandeira was told it was just going to be a "short" hearing.

30.      To view Donaldson's First Appearance, the four (4) murder victims' families were taken to a special viewing room to watch the hearing by remote TV. Prior to arriving for the

First Appearance, Ms. Lavandeira renewed her request for an ASL interpreter to the victim's advocate and one of the state attorneys. She was told the court could not provide an interpreter due to budgeting problems.

31. Again, Ms. Lavandeira's niece attempted to interpret for Ms. Lavandeira in ASL, and for Ms. Lavandeira's parents in Spanish. Ms. Lavandeira continued to request an interpreter from the SAO, the victim's advocate, and individuals believed to be court personnel, but no interpreter was provided. Ms. Lavandeira was unable to have meaningful access to the hearing, or the conversations being held in the room.

32. On November 29, 2017, directly after Donaldson's First Appearance, a member of Ms. Lavandeira's family contacted TPD, Detective Hill, requesting a meeting to discuss what TPD now knew about Monica's murder. The meeting was scheduled approximately two (2) hours after the request for a meeting was made. Ms. Lavandeira's niece spoke to the detective and made a request for an ASL interpreter for Ms. Lavandeira. Upon arrival, there was no interpreter provided, either by way of an onsite interpreter or through VRI.

33. At the November 29, 2017, meeting with TPD, there were approximately nine (9) family members (to include Ms. Lavandeira's parents who speak Spanish) and Detective Hill. On information and belief, the meeting lasted approximately one (1) hour.

34. Ms. Lavandeira renewed her request for an ASL interpreter, but was told TPD did not secure an interpreter. Again, Ms. Lavandeira's niece attempted to interpret the meeting in Spanish and ASL, at the same time. Ms. Lavandeira, the mother of the murder victim, was left out of the conversation about her daughter's murder because she was deaf, and TPD, once again, failed to secure an interpreter.

35. On or around December 1, 2017, TPD held another press conference to announce a reward would be provided to an employee from McDonald's who reported Donaldson. Ms. Lavandeira was invited to the press conference. Prior to the press conference, an interpreter request was made, but the request was denied.

36. At the press conference, Ms. Lavandeira wanted to talk with the other people present, interact with the police, and essentially participate in the somewhat cathartic experience. However, she was denied that opportunity due to the failure of TPD to secure an interpreter. Again, the Plaintiff's niece was forced to interpret for Ms. Lavandeira in ASL, while concurrently interpreting in Spanish for Monica's grandparents.

37. On a date believed to be in January of 2018, the VAP and the SOA scheduled a plenary meeting to talk with the four (4) victims' families. The meeting was to provide the families an update on the case against Donaldson, answer their questions, and again offer *assistance*. Ms. Lavandeira requested an ASL interpreter for the meeting, but the request was again denied.

38. In attendance were three (3) attorneys from the SAO which included Andrew H. Warren. An open and heartfelt discussion ensued about the SAO's plan to seek the death penalty for Donaldson. The room was full of upset family members peppering questions about the case and the evidence, etc. Ms. Lavandeira was unable to understand or participate in this meeting, to the point that during the meeting she broke down and cried.

39. Due to the fact that the SAO failed to provide an interpreter, Ms. Lavandeira's niece was, again, forced to try to interpret in ASL for Ms. Lavandeira, and in Spanish for Ms. Lavandeira's parents.

40. Ms. Lavandeira felt forgotten and extreme despair as she struggled to understand what was being said in the meeting. She was upset that her niece was being forced to interpret for her in ASL and her parents in Spanish. She was desperate to learn what the other family members were asking, what happened to Monica, and the SAO's plans to punish Donaldson. She was appalled at the cruelty she endured. The meeting continued for approximately two (2) hours.

41. After the meeting, Ms. Lavandeira broke down and cried inconsolably. It was now approximately three (3) months after her daughter's murder and the opportunity to interact with the TPD and the SAO, as the mother of a murder victim, had been lost, and she continued to be shut out.

42. Sometime soon after the plenary meeting, believed to be on January 8, 2018, the SAO set another meeting to meet individually with each family.

43. The SAO contacted Ms. Yurian Gutierrez to set the meeting at Monica's grandparents' home in Tampa. Again, a request was made for an ASL interpreter for the meeting, but the request was denied.

44. On information and belief at least three (3) attorneys from the SAO came to the Monica's grandparents' home in Tampa, to include Attorney Andrew H. Warren. Also in attendance were Ms. Lavandeira, her parents (who spoke only Spanish), Yurian Gutierrez and her husband, and Monica's estranged father who participated by telephone.

45. Due to the failure of the SAO to secure an interpreter, Ms. Gutierrez was again forced to interpret in Spanish for Ms. Lavandeira's parents, while concurrently interpreting in ASL for Ms. Lavandeira. Again, this was completely ineffective, and denied the Plaintiff any meaningful access to the meeting.

46. Hoping to gain some information on the case, Ms. Lavandeira attended several court hearings. Unfortunately, her requests for ASL interpreters were also denied by the 13th Judicial Courthouse. The victim's advocate, who had been working with the victims' families and the attorneys[7] and who held the victim family meetings, was present at the hearings.

47. On January 26, 2018, Ms. Lavandeira and her deaf partner attended a court hearing for Donaldson at the 13th Judicial Circuit Courthouse. Prior to the hearing, she requested an interpreter from the SAO, but was told the court could not afford an interpreter.

48. On February 16, 2018, Ms. Lavandeira and her deaf partner attended Donaldson's court hearing. Prior to the hearing, she requested ASL interpreters, but the requests were denied. This pattern of denial continued.

49. On March 8, 2018, Ms. Lavandeira and her deaf partner attended Donaldson's court hearing, and prior to and <u>during</u> the hearing, they requested ASL interpreters, but the requests were denied.

50. On June 27, 2018, Ms. Lavandeira and her deaf partner attended Donaldson's court hearing at the 13th Judicial Courthouse. Prior to the hearing, they requested ASL interpreters, but the requests were denied.

51. On July 26, 2018, Ms. Lavandeira and her deaf partner attended Donaldson's court hearing related to his competency to stand trial at the 13th Judicial Courthouse. Prior to the hearing, they requested ASL interpreters, but the request was denied.

---

[7] On information and belief, the same victim's assistant was at each court hearing. However, the attorneys present at the hearings would vary. On information and belief, there was always at least one attorney who attended the November 7, 2017 VAP meeting, or the January 2018 plenary family meeting, or the January 2018 meeting at Monica's grandparents' home. These individuals would wave and acknowledge Ms. Lavandeira in the courtroom, in plain sight without an ASL interpreter.

12

52. At the October 30, 2018 court hearing, the Court finally provided ASL interpreters, but on January 29, 2019, upon her request for interpreters, she was told no interpreter would be provided—so she refused to attend.

53. On February 27, 2019, the court provided one (1) ASL interpreter for the hearing called to discuss some handwritten notes by Donaldson. However, the interpreter arrived late for the hearing.

54. During the investigation TPD continually disregarded the requirement to accommodate deaf people.

55. According to the records obtained in a public records request, prior to the arrest of Donaldson, at least one (1) <u>deaf</u> witness tried to report information they thought was critical to help capture the serial murderer. The records show a written note by the deaf citizen asking for an interpreter to speak to TPD, the request was denied. Failing to provide interpreters to deaf citizens, who, like any citizen, may have helpful information to apprehend the killer, impeded Ms. Lavandeira's rights as a victim relying upon the TPD to find her daughter's killer.

56. In approximately February of 2019 <u>fourteen (14) months</u> after Monica's murder, Ms. Lavandeira was told to watch a news story entitled "51 Days of Terror". Ms. Lavandeira tries to access the story on Facebook, but it is a podcast consisting of audio only, and there are no captions.

57. Ms. Lavandeira asked a friend, who knows sign language, to interpret the story to her in ASL. Now, approximately fourteen (14) months after her daughter's murder, after the public knows, and in spite of the Defendants' defiance to accommodate her, Plaintiff learns what

happened to her daughter, and the circumstances around her murder. She is outraged, and helpless as she continues to be shut out of the system.

58. The trial of Donaldson has not occurred, and Ms. Lavandeira shall, in the future, require the services of TPD, the Courthouse, and the SAO as a family member of a victim. Ms. Lavandeira lives in Tampa, and shall use the Defendants' services in the future, as she has done in the past.

59. Defendants' callous and brazen ongoing denial of her federally protected rights were intentional, and continued even after many, many request were made to accommodate Ms. Lavandeira.

60. As a result of Defendants' actions described above, Ms. Lavandeira suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities.

## COUNT I

## VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

61. Plaintiff repeats and re-alleges allegations ¶¶ 1- 41, 54-60 in support of her claims against Defendants, Tampa Police Department and Brian Dugan *in his official capacity as* Chief of the Tampa Police Department.

62. Plaintiff repeats and re-alleges allegations ¶¶ 1-11, 17, 24, 29-31, 46-60 in support of her claims against Defendant, The Thirteenth Judicial Circuit Courthouse.

63. Plaintiff repeats and re-alleges allegations ¶¶ 1-60 in support of her claims against Defendants, Office of The State Attorney, Thirteenth Judicial Circuit, and Andrew H. Warren *in his official capacity* as State Attorney for the Thirteenth Judicial Circuit.

64. In Count I, Plaintiff seeks declaratory relief, permanent injunctive relief, and monetary damages pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and its implementing regulations.

65. Plaintiff is deaf, and her disabilities substantially limit major life activities as defined by Title II of the ADA. Plaintiff meets the essential eligibility requirements for Defendants' services at all times material hereto and is entitled to the protections of the ADA under 42 U.S.C. § 12132, *et seq.*, and its implementing regulations.

66. All Defendants are public entities pursuant to 42 U.S.C. § 12131 (1), and are subject to the mandates of Title II of the ADA and its implementing regulations.

67. No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

68. Defendants must provide effective auxiliary aids to ensure deaf and hard of hearing people can access their services. The term auxiliary aids and services include qualified interpreters, or other effective methods of making aurally delivered materials available to individuals with hearing impairments. 42 U.S.C. § 12103 (1) (A).

69. Defendants failed to give "primary consideration" to the requests of individuals with disabilities in determining what auxiliary aids and services are necessary. 28 C.F.R. § 35.160(b)(2). (Emphasis added).

70. In order to be effective, auxiliary aids and services must be provided in accessible formats, <u>in a timely manner</u>, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 35.160 (b) (2). (Emphasis added).

71. A public entity shall not require an individual with a disability to bring another individual to interpret for him or her. 28 C.F.R. § 35.160.

72. Defendants' actions were intentional and violated the rights of the Plaintiff by their refusal to reasonably accommodate Plaintiff, even after Defendants were put on full notice of their obligations to abate such discriminatory actions.

73. Plaintiff has been injured and aggrieved by, and will continue to be injured and aggrieved by Defendants' intentional discrimination.

74. As a resident of the city of Tampa, and the mother of a murder victim, Plaintiff shall continue to use Defendants' services.

**WHEREFORE**, Plaintiff requests the relief set forth below.

### COUNT II

### VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973

75. Plaintiff repeats and re-alleges allegations ¶¶ 1- 41, 54-60 in support of her claims against Defendants, Tampa Police Department and Brian Dugan *in his official capacity as* Chief of the Tampa Police Department.

76. Plaintiff repeats and re-alleges allegations ¶¶ 1-11, 17, 24, 29-31, 46-60 in support of her claims against Defendant, Thirteenth Judicial Circuit Courthouse.

77. Plaintiff repeats and re-alleges allegations ¶¶ 1-60 in support of her claims against Defendants, Office of the State Attorney, Thirteenth Judicial Circuit, and Andrew H. Warren *in his official capacity* as State Attorney for the Thirteenth Judicial Circuit.

78. Plaintiff in this matter requests declaratory relief, permanent injunctive relief, and seeks monetary damages pursuant to Section 504.

79. Plaintiff is deaf, and her disabilities substantially limit major life activities, and she is therefore, considered to be an individual with a disability under Section 504. Plaintiff is otherwise qualified under Section 504 because she meets the essential eligibility requirements for Defendants' services at all times material hereto.

80. In Count II, Plaintiff alleges Defendants discriminate against people with disabilities in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in Section 705 (20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

81. Defendants are recipients of federal financial assistance, and, therefore, subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Defendants have discriminated against Plaintiff on the basis of her disabilities in violation of 29 U.S.C. § 794 and its implementing regulations as more fully described in Count I. Such discrimination includes, but is not limited to, failure to: provide auxiliary aids and services, modify policies and procedures to prevent discriminatory exclusion from and or denial of services, and ensure that communication with Plaintiff was as effective as communications with non-disabled people.

82. Defendants' actions were intentional and violated the rights of the Plaintiff by their refusal to reasonably accommodate Plaintiff, even after Defendants were repeatedly put on notice of their obligations to abate such discriminatory actions.

83. As a result of Defendants' actions described above, Plaintiff suffered, continues to suffer, and will suffer in the future irreparable loss and injury including, but not limited to, degradation, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities.

84. As a resident of the city of Tampa, and the mother of a murder victim, Plaintiff shall continue to use Defendants' services.

**WHEREFORE**, Plaintiff requests the relief set forth below.

### RELIEF REQUESTED

**WHEREFORE,** Plaintiff requests the following relief:

A. The Court assume jurisdiction;

B. The Court enter a declaratory judgment that the actions of Defendants, described in this Complaint, be in violation of the ADA and Section 504 of the Rehabilitation Act;

C. Enter a permanent injunction for the Plaintiff enjoining Defendants, their successors, agents and employees, and all other persons in concert therewith, from taking or continuing any action which has the purpose or effect of discriminating against the Plaintiff on the basis of failing to effectively communicate and failing to provide meaningful access to services, thereby,

        provide services in violation of the ADA and Section 504 of the Rehabilitation Act;

D.    Award monetary damages to Ms. Lavandeira for her degradation, mistreatment, and humiliation as a result of Defendants' discriminatory actions in violation of Title II of the ADA;

E.    Award monetary damages to Ms. Lavandeira for her degradation, mistreatment, and loss of dignity as a result of Defendants' discriminatory actions in violation of Section 504 of the Rehabilitation Act;

F.    Award reasonable attorney's fees, expenses, and costs of suit; and

G.    Grant such other relief as the Court may deem equitable and just under the circumstances.

## JURY DEMAND

Plaintiff demands trial by jury on all issues which can be heard by a jury.

Date: January 23, 2020.

        Respectfully submitted,
        Morgan & Morgan

        */s/ Sharon Caserta*
        Sharon Caserta, Esq.
        Florida Bar No.: 0023117
        Morgan & Morgan
        Deaf /Disability Rights
        76 South Laura Street, Suite 1100
        Jacksonville, FL 32202
        (904) 361-0078 (Voice)
        (904) 245-1121 (Videophone)
        (904) 361-4305 (Facsimile)
        scaserta@forthepeople.com
        *Trial Counsel for Plaintiff*