UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OLGA LAVANDEIRA,

     Plaintiff,

v.                             CASE NO. 8:20-cv-169-T-23CPT

TAMPA POLICE DEPARTMENT, et al.,

     Defendants.

_____/

## ORDER

Olga Lavandeira, the deaf mother of a murder victim, alleges (Doc. 1) that each defendant failed to provide her with a sign language interpreter during various public hearings, meetings, and services.  Alleging violations of both Title II of the Americans with Disabilities Act (Count I) and Section 504 of the Rehabilitation Act of 1973 (Count II), Lavandeira sues the Tampa Police Department; Brian Dugan in his official capacity as the police chief; the "Thirteenth Judicial Circuit Courthouse"; the Office of the State Attorney for the Thirteenth Judicial Circuit; and Andrew Warren in his official capacity as the state attorney for the Thirteenth Judicial Circuit.  Each defendant moves (Docs. 13, 14, 23) to dismiss.

## BACKGROUND

Lavandeira is the deaf mother of Monica Hoffa, murdered by the "Seminole Heights Killer."  On November 28, 2017, the Tampa Police Department (TPD) arrested Howell Donaldson III and charged him with four counts of murder.  Soon

after Donaldson's arrest, a representative from the Victim Assistance Program, a service of the state attorney's office, sent a text message to Lavandeira to notify her about Donaldson's first appearance in the Thirteenth Judicial Circuit. Although Lavandeira allegedly requested an American Sign Language interpreter for the hearing, Lavandeira alleges that "[t]he request was denied." (Doc. 1 at 8)

After this alleged denial, Lavandeira attended "several court hearings" at the Hillsborough County courthouse and attended several meetings with representatives of both the state attorney's office and TPD. (Doc. 1 at 12) Lavandeira alleges that from November 2017 through July 2018, each defendant failed to provide an interpreter during these hearings and meetings. And when the Thirteenth Judicial Circuit furnished Lavandeira with an interpreter on February 27, 2019, the interpretive services allegedly proved inadequate. In sum, Lavandeira alleges that the "[d]efendants' callous and brazen ongoing denial of her federally protected rights [was] intentional, and continued even after many, many request[s]." (Doc. 1 at 14)

Lavandeira claims that each defendant's failure to provide her with an interpreter for meetings and hearings amounts to unlawful discrimination and, consequently, entitles her to damages. Further, Lavandeira requests injunctive and declaratory relief because, according to Lavandeira, she "shall use the defendants' services in the future." (Doc. 1 at 14)

## DISCUSSION

Each defendant moves (Docs. 13, 14, 23) to dismiss and Lavandeira opposes (Docs. 21, 22, 32) dismissal.

### I. TPD's Motion to Dismiss

Lavandeira sues both TPD and Brian Dugan in his official capacity as police chief.  Dugan and TPD argue (Doc. 13) that Lavandeira's claims against TPD warrant dismissal because "the police department . . . is not an entity subject to suit." (Doc. 13 at 4)  Although Lavandeira opposes dismissal, even a brief review of the governing legal authority reveals that Lavandeira's claims against TPD and Chief Dugan are actually claims against the City of Tampa.  *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity. . .  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is . . . to be treated as a suit against the entity.") (internal citations and quotations omitted); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir.1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official capacity actions against local government officials, because local government units can be sued directly."); *American Humanist Association, Inc. v. City of Ocala*, 127 F. Supp. 3d 1265, 1273 (M.D. Fla. 2015).  Consequently, the conclusion of this order directs Lavandeira to name the proper party in an amended complaint; Lavandeira's claims are claims against the City.

- 3 -

A.  Article III Standing

The City chooses to frame the motion to dismiss as a challenge to Lavandeira's "standing" to sue for injunctive and declaratory relief.  The City argues that Lavandeira presents no facts demonstrating a likelihood of the City's harming her in the future.  Also, the City asserts that "there is no factual support for Plaintiff's conclusory allegation that she 'would require the services of TPD,'" and the City argues that Lavandeira "does not allege . . . that she is likely to need TPD's services for any reason in the future."  (Doc. 13 at 5–6)  According to the City, therefore, injunctive relief is unfounded.

Lavandeira responds that "she shall use the services of TPD" in the future and that "TPD is still involved with the victims' families, and are required to continue to provide services to Ms. Lavandeira when she requires them."  (Doc. 21 at 6)  Further, Lavandeira argues that her "need for TPD's services in the future also extends to the TPD press conferences that will more than likely be held," and she asserts that she "believes that [TPD's] accreditation include[s] standards designed to promote excellence when working with victims and their families."  (Doc. 21 at 5)  In a word, the parties dispute Lavandeira's "standing" to pursue claims for injunctive and declaratory relief.

Confusion about "standing" is widespread in actions under Article III. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 751 (1984) ("[T]he constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition."), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

118 (2014); William Fletcher, *The Structure of Standing*, 98 YALE L.J. 221, 221 (1988) ("The structure of standing law in the federal courts has long been criticized as incoherent."). Despite the confusion, a district court retains the duty to confirm a party's legal standing. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005). One of the reasons for the "incoherence" is that the elements of standing subtly evoke the classical elements necessary to state a claim for relief: a duty, breach of the duty, and an injury. Whether a pleading reveals a lack of standing or a failure to state a claim — or both — is a distinction that is elemental but sometimes elusive to many pleaders and drafters of motions (and orders). (Clarity is assisted by distinguishing between (1) a circumstance in which no claim exists that the plaintiff — or anyone else — can assert because a necessary element of the prospective claim is missing and (2) a circumstance in which a claim exists, but the plaintiff is not allowed by law to assert the claim because only someone else — or, perhaps, no one — can assert the claim.) For the moment, this order indulges — with studied hesitation — the parties' treatment of the claimed defect as a question of "standing."

Certain principles of Article III standing are reasonably constant and lend some shape and definition. For example, only a party with "a personal stake in the outcome" of a controversy can sue in a federal court, *Baker v. Carr*, 369 U.S. 186, 204 (1962), and a party might enjoy standing to pursue a claim for damages but lack standing in a claim for injunctive or declaratory relief or both. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that the plaintiff's injury likely confers

- 5 -

standing to bring a damages action but that "standing to seek . . . [an] injunction . . . depend[s] on whether . . . [the plaintiff] was likely to suffer future injury"); *Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.")

To establish Article III standing for an injunction, a plaintiff "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013) (quotation marks omitted). Showing a "sufficient likelihood" requires adducing "a real and immediate — as opposed to a merely conjectural or hypothetical — threat of future injury." *Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir. 2001). "'[S]ome day' intentions — without any description of concrete plans, or indeed even any specification of *when* the some day will be — do not support a finding of the 'actual or imminent' injury . . . ." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

In an action such as this one, determining the likelihood of a future injury generally requires considering (1) the proximity of the defendant's location to the plaintiff's residence, (2) the plaintiff's past use of the defendant's services, (3) "the definiteness of the plaintiff's plan to return," and (4) the frequency of the plaintiff's travel near the defendant's location. *Houston*, 733 F.3d at 1337, n.6.

Although Lavandeira lives in Tampa, her "past patronage" of TPD was episodic and impelled by an acute and singular circumstance. Much more to the point, Lavandeira describes no right to, no fixed plan to, and no identifiable occasion

- 6 -

to, use TPD's services in the future.  *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) ("In assessing whether a future injury is likely to occur, we consider whether the plaintiff is likely to have another encounter with a government officer due to the same conduct that caused the past injury.").  Lavandeira states that she "shall use the defendants' services in the future," but Lavandeira's general assertion is far from a "description of concrete plans."  *Lujan*, 504 U.S. at 564.  Instead, Lavandeira's claim that "she shall use the services of TPD" constitute "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

To further support her ostensible intention to use TPD's services, Lavandeira states that press conferences "will more than likely be held" and that TPD must "provide services . . . when she requires them."  (Doc. 21 at 5–6)  But Lavandeira's "plans" are contingent, tentative, and lack the "definiteness" prescribed by principles of Article III standing.  *Houston*, 733 F.3d at 1337, n.6.

Lavandeira states in her response that "TPD still has some of the possessions found on Monica when she was discovered murdered" and that "those items are rightfully owned, and shall be returned to" Lavandeira.  (Doc. 21 at 6)  However, Lavandeira identifies neither an allegation nor an exhibit suggesting that Lavandeira plans to return to the police station to obtain Monica's effects, and in reviewing a motion to dismiss, "the court limits its considerations to the pleadings and exhibits attached thereto."  *GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir.

1993).  Further, a party "cannot . . . use his briefing to add new allegations and argue that those new assertions support his cause of action."  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 705 (11th Cir. 2016); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.2004).  Therefore, Lavandeira's conclusory assertion that she intends to use the defendants' services permits no plausible inference of a definite plan.  *Oxford Asset Mgt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts" fail to support a claim).

"[P]ast incidents of discrimination" alone support Lavandeira's assertion of a prospectively "imminent injury," but abbreviated, former incidents of alleged discrimination (without more) fail to establish a "sufficient likelihood" of future injury.  *Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir. 2001).  According to the allegations in the complaint, TPD's involvement with Lavandeira is essentially finished, and her "plans" to use the services of TPD remain contingent and speculative.  *Lyons*, 461 U.S. 95, 105 (1983) ("That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages . . . , does nothing to establish a real and immediate threat that he would again be stopped . . . [and] illegally choke[d] into unconsciousness" in the future.).  Thus, measured by the content of her complaint, Lavandeira lacks standing to assert a claim for injunctive and declaratory relief against TPD.

B. Damages Claim against the City

Next, Lavandeira demands damages from the City.  Lavandeira "must prove that the entity that [s]he has sued engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'"  *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019).

In support of her damages claim, Lavandeira alleges that the City deliberately discriminated against her by denying her interpreter services during meetings and press conferences.  For example, Lavandeira alleges that during a press conference, "[the City] used a 'fake' sign language interpreter." (Doc. 1 at 8)  Lavandeira alleges that at another press conference "an interpreter request was made, but the request was denied." (Doc. 1 at 10)  Further, Lavandeira states that instead of contacting her directly the City contacted other people such as her estranged husband about her daughter's death.

According to the City, Lavandeira establishes no "deliberate indifference" because she "fails to allege that any of [her] interactions involved discriminatory action by a City official with the requisite 'substantial supervisory authority.'" (Doc. 13 at 7)  Although Lavandeira alleges that she met with Detective Hill twice, the City argues that Lavandeira "does not allege that she (or anyone on her behalf) requested that [Detective] Hill obtain an interpreter"; neither does she allege that Hill's position with TPD enabled him to resolve the alleged discrimination.  (Doc. 13 at 8)  Also, the City argues that Lavandeira fails to allege that the City arranged for, or knew about, an "imposter" interpreter during the press conference.  (Doc. 13 at 9)

- 9 -

And the City argues that TPD's contacting Lavandeira's husband (instead of her) to inform Lavandeira about Donaldson's arrest lacks pertinence to her discrimination claims. (Doc. 13 at 8–9)  In short, the City argues that Lavandeira fails to sustain a claim for damages because she provides insufficient detail to permit an inference of "deliberate indifference" or discrimination. (Doc. 13 at 10)

Lavandeira counters that "the moniker of an 'official' does not rest upon a title, but the authority to accommodate deaf people." (Doc. 21 at 9)  Also, she observes that Detective Hill is the "lead detective"; that the "individual from the TPD who called the public press conferences" retains sufficient supervisory authority to qualify as an "official" (Doc. 21 at 10–11); and that, because the inquiry about who constitutes an "official" is "fact intensive," her "claims should not be dismissed this early in the litigation." (Doc. 21 at 11)

To demonstrate a government entity's deliberate indifference, an "exacting standard,"[1] Lavandeira must establish that an "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf had actual knowledge of discrimination in the entity's programs and failed adequately to respond." *Silberman*, 927 F.3d at 1134 (quoting *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 349 (11th Cir. 2012)) (internal quotations and alterations omitted).  Although no requirement exists for Lavandeira to demonstrate that an official is "authorized to set an entity's policy," Lavandeira

---

[1] *J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017).

needs to show that an official retains "substantial supervisory authority." *Liese*, 701 F.3d at 350.  That is, Lavandeira must allege sufficient facts to establish that [the City] official's decision or action "constitute[s] an official decision by [the City] itself not to remedy" the alleged discrimination.  *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1255 (11th Cir. 2010).

The complaint's allegations, interpreted in the light most favorable to Lavandeira, create a factual question about (1) whether Hill knew that the City perpetuated discriminatory practices, (2) whether Hill retained the authority to correct the allegedly discriminatory practices, and (3) whether Hill failed to adequately respond to the alleged discrimination.  Not only does Lavandeira allege that Hill observed her disability during his meeting with the family, but she alleges that Hill failed to correct TPD's oversight by providing an interpreter.  (Doc. 1 at 6, 9)  And without the benefit of additional discovery, Hill's authority as lead detective to address the alleged discrimination remains disputed.  *See, e.g.*, *J.S., III*, 877 F.3d at 989 (employing a "fact-intensive" framework and holding that a teacher might qualify as an "official" because "teachers are responsible for instructing and supervising the work of volunteers and aides") (internal quotations omitted).

## II. The Thirteenth Judicial Circuit's Motion to Dismiss

Moving to dismiss, the Thirteenth Judicial Circuit argues that Lavandeira fails to state a Title II claim against the Thirteenth Judicial Circuit because Lavandeira fails to allege that she "was denied . . . benefit[s] by . . . the Thirteenth Judicial Circuit."  (Doc. 14 at 5)  According to the Thirteenth Judicial Circuit, although the

- 11 -

"[c]omplaint does indicate that Plaintiff made requests to the Tampa Police Department and the State Attorney's Office[,] there is no allegation[ ] in the Complaint that Plaintiff made a direct request to" the Thirteenth Judicial Circuit. (Doc. 14 at 5)  In a similar vein, the Thirteenth Judicial Circuit argues that Lavandeira fails to satisfy Title II's notice requirement because "it is unclear as to whether Plaintiff directly requested an interpreter from [the Thirteenth Judicial Circuit]."  (Doc. 14 at 7)  Therefore, the Thirteenth Judicial Circuit argues that Lavandeira's claims require dismissal because the "allegations . . . do not indicate how, when, and by what means Plaintiff made such requests."  (Doc. 14 at 7)

The complaint explicitly alleges that Lavandeira's "requests for ASL interpreters were . . . denied by the 13th Judicial Courthouse."  (Doc. 1 at 12)  And later in the complaint Lavandeira alleges:

> On July 26, 2018, Ms. Lavandeira and her deaf partner attended Donaldson's court hearing related to his competency to stand trial at the 13th Judicial Courthouse. Prior to the hearing, they requested ASL interpreters, but the request was denied. At the October 30, 2018 court hearing, the Court finally provided ASL interpreters, but on January 29, 2019, upon her request for interpreters, she was told no interpreter would be provided—so she refused to attend. On February 27, 2019, the court provided one (1) ASL interpreter for the hearing called to discuss some handwritten notes by Donaldson. However, the interpreter arrived late for the hearing.

(Doc. 1 at 13)  Lavandeira's assertion that "the Court finally provided ASL interpreters" immediately follows her assertion that on a previous occasion "the request was denied" — by whom remains unstated.  Lavandeira's oscillating between discussing the denials and discussing the court's provision of an interpreter

implies — weakly but, viewed indulgently, perhaps sufficiently — that the denials came from the Thirteenth Judicial Circuit (although not from the "Courthouse").

About the Section 504 claim, the Thirteenth Judicial Circuit argues that Lavandeira "has not sufficiently alleged that [the d]efendant . . . receives federal financial assistance of a specific program that [the p]laintiff is entitled to participate in." (Doc. 14 at 6)  However, Lavandeira unambiguously states that the "[d]efendants are recipients of federal financial assistance," and the Thirteenth Judicial Circuit cannot reasonably suggest that Lavandeira enjoys no entitlement to attend judicial proceedings.  (Doc. 1 at 4, 17)  The Thirteenth Judicial Circuit's federal-funding argument is meritless.

Finally, the Thirteenth Judicial Circuit argues that Lavandeira lacks standing to sue because Lavandeira fails "to establish . . . there is a causal connection between Plaintiff's injury and Defendant." (Doc. 14 at 8)   Despite the Thirteenth Judicial Circuit's insistence, Lavandeira expressly alleges that she "has been injured and aggrieved by, and will continue to be injured and aggrieved by Defendants' intentional discrimination." (Doc. 1 at 16)  And the facts alleged permit a reasonable inference of a causal connection.

Therefore, a reasonable construction of the complaint confirms that Lavandeira asserts that the Thirteenth Judicial Circuit (1) denied Lavandeira's request, (2) receives federal money, and (3) caused Lavandeira's injury.  In other words, the allegations against the Thirteenth Judicial Circuit permit "a reasonable inference that the defendant is liable for the misconduct alleged.'" *Simpson v.*

*Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

### III. The State Attorney's Motion to Dismiss

The state attorney moves (Doc. 23) to dismiss because (1) the complaint is a shotgun pleading, (2) Lavandeira fails to state a claim, (3) sovereign immunity bars Lavandeira's claim to damages, and (4) Lavandeira lacks standing.

#### A. Shotgun Complaint

The state attorney[2] argues that the complaint is a shotgun pleading because, even though Lavandeira alleges paragraphs one through sixty to support her claims against the state attorney, the allegations "include many paragraphs that do not appear to relate to acts or omissions of the SAO." (Doc. 23 at 3) The state attorney argues that "[b]y including allegations pertaining to other Defendants, Plaintiff wholly obscures which Defendant she believes is responsible for particular failures or omissions to provide an independent ASL interpreter." (Doc. 23 at 4) In response, Lavandeira argues that (1) she pleaded "the allegations against each defendant narrowly enough to meet the notice requirements" and (2) "the record is not developed enough to determine the involvement by the SAO." (Doc. 32 at 3–4)

---

[2] Although Lavandeira sues both the "state attorney's office" (not an entity subject to suit) and Andrew Warren in his official capacity as state attorney for the Thirteenth Judicial Circuit, a suit against a state official in his official capacity is tantamount to "a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, in effect, Lavandeira's action against both of these defendants constitutes an action against Florida. This order addresses the defendants in this section as "the state attorney," and the conclusion of this order directs Lavandeira to remove as duplicative a claim against the "state attorney's office" in an amended complaint.

- 14 -

One way a complaint merits designation as a "shotgun pleading" is if the complaint "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).  This type of shotgun pleading, like others, fails "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Weiland*, 792 F.3d at 1323.

By re-alleging against the state attorney each paragraph (although many lack pertinence to the state attorney), Lavandeira suggests that the state attorney holds responsibility for each alleged violation of Title II and the Rehabilitation Act.  Although a pleading may include more than one defendant in a single claim, Lavandeira's complaint fails to notify the state attorney of each claim alleged against the state attorney.  In other words, Lavandeira's complaint is a shotgun pleading. *Worthy v. City of Phenix City, Alabama*, 930 F.3d 1206, 1214 (11th Cir. 2019) (characterizing the complaint as a "shotgun complaint" because the plaintiff "makes it difficult to discern the types of claims they are asserting and whether they pleaded facts sufficient to causally connect those claims to the injury they suffered").

B. Stating a Claim Under Title II and the Rehabilitation Act

The state attorney argues that "for proceedings provided by the courts, it is the Court and not the SAO which is responsible for provision of accommodations, auxiliary aids, and services such as ASL interpreters."  (Doc. 23 at 6)  And the state attorney argues that, although the Thirteenth Judicial Circuit retains the

responsibility to furnish Lavandeira with an ASL interpreter, Lavandeira (1) fails "to show that she was excluded from or denied participation in the three referenced meetings with the SAO" and (2) fails to establish the discriminatory intent required to succeed on a claim for compensatory damages.  (Doc. 23 at 13)

To state a claim against the state attorney under Title II and the Rehabilitation Act,[3] Lavandeira must allege (1) that she qualifies as a disabled person, (2) that the state attorney excluded her from participating in public services or programs, and (3) that the exclusion or discrimination occurred because of her disability.  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

The parties agree that Lavandeira is deaf.  Whether the state attorney excluded Lavandeira from a public service because of her disability depends on whether she enjoyed an "equal opportunity" — compared to someone without a disability — to receive the benefits of the public service.  *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir. 2012).  Lavandeira alleges three instances of discrimination during meetings with the state attorney, his assistant state attorneys, or both.

First, Lavandeira alleges that for a November 7, 2017 meeting she "requested an ASL interpreter . . . but the request was denied" and, consequently, "Lavandeira . . . was left out."  (Doc. 1 at 7–8)  Second, Lavandeira alleges that the state attorney

---

[3] Title II and the Rehabilitation Act receive the same treatment in this analysis. *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

refused to provide an interpreter for a January 2018 meeting at which the state attorney and two of his assistant state attorneys discussed plans to "seek the death penalty for Donaldson." (Doc. 1 at 10)  Lavandeira alleges that during the two-hour meeting she "was unable to understand or participate" and she "continued to be shut out" by the state attorney. (Doc. 1 at 10–11)  Third, Lavandeira alleges that the state attorney refused to provide an interpreter for a meeting with her family, which refusal "denied [Lavandeira] any meaningful access to the meeting." (Doc. 1 at 11)  These three allegations (and the reasonable inferences that naturally follow from them) permit a plausible inference that the state attorney failed to afford Lavandeira, a disabled person, an "equal opportunity" to receive the benefits of the meetings by denying her request for an interpreter.  Lavandeira states a claim under Title II and the Rehabilitation Act.

## C. Sovereign Immunity

Lavandeira includes in the complaint a claim for damages.  The state attorney asserts an entitlement "to sovereign immunity in this action for damages, to the extent that Plaintiff sues for the failure to provide ASL interpreters for meetings with the SAO and its Victim Assistance Program." (Doc. 23 at 14)  In support, the state attorney argues (1) that the plaintiff's alleged inability to obtain information about her daughter's death "does not implicate conduct which violates the U.S. Constitution" and (2) that "the State is under no general affirmative duty to provide substantive services to its citizens." (Doc. 23 at 17–18)  Thus, according to the state attorney, "[b]ecause Plaintiff does not plead a constitutional violation as to

- 17 -

the SAO, her claims against the SAO for damages must be dismissed, based on Eleventh Amendment immunity."

Opposing dismissal, Lavandeira argues that the state attorney's office and the victim assistance program (VAP) "are mandated to assist victims like Ms. Lavandeira, and failed to do so consistently and continuously."  (Doc. 32 at 5)  Also, she argues that "her case is not about accessing government information, it's about the government's affirmative obligation to obtain information from the Plaintiff to preserve access to the judicial process."  (Doc. 32 at 15)  Explained differently, according to Lavandeira, her "case embodies court access as outlined in *Lane*, and unless she can confer with the SAO that access is extinguished."  (Doc. 32 at 17)

"Dual sovereignty" is a distinguishing feature of the United States' constitutional structure.  *Sossamon v. Texas*, 563 U.S. 277, 283 (2011).  A critical component of a state's "sovereign dignity" is the state's "immunity from private suits" in federal court; the Eleventh Amendment secures the state's immunity. *Sossamon*, 563 U.S. at 283; *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  "This immunity extends to state agencies," *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Com'n*, 226 F.3d 1226, 1231 (11th Cir. 2000), and "Florida law characterizes the State Attorney and the State Attorney's Office as an arm of the state," that is, a party entitled to sovereign immunity.  *Farrell v. Woodham*, 2002 WL 32107645, at *3 (M.D. Fla. 2002) (J., Steele); *see also Perez v. State Attorney's Office*, 2008 WL 4539430, at *2 (M.D. Fla. 2008).  However, Congress may validly abrogate sovereign immunity (1) by "unequivocally express[ing] its intent to abrogate that immunity"

- 18 -

and (2) by legislating in accord with "a valid grant of constitutional authority." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004).

Congress's intent to abrogate sovereign immunity under Title II is unmistakable. As 42 U.S.C. § 12202 explains, "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." Although Congress typically retains the authority to abrogate sovereign immunity under Section 5 of the Fourteenth Amendment, *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365 (2001), Congress can remedy "a somewhat broader swath of conduct, including that which is not itself forbidden" by the Fourteenth Amendment. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000). That is, if a constitutional right triggers heightened scrutiny or is regarded as "fundamental," Congress enjoys broader latitude to abrogate immunity under Section 5. *Lane*, 541 U.S. at 529. But the legislation must exhibit "congruence and proportionality between the injury to be prevented . . . and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

Under Eleventh Circuit precedent, determining whether Title II's abrogation is "congruent and proportional" requires examining (1) which rights Congress aimed to "enforce" when enacting the ADA, (2) "whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary," and (3) "whether Title II is an appropriate

response to this history and pattern of unequal treatment." *Nat'l Ass'n of the Deaf v. Fla.*, 945 F.3d 1339, 1348 (11th Cir. 2020).

   *Lane* finds that several features of public services and programs have unconstitutionally discriminated against disabled people. *Lane*, 541 U.S. at 510, 524–25. But whether Title II, as applied to Lavandeira's putative discrimination, constitutes a valid exercise of congressional authority receives analysis on an "individual or 'as-applied' basis in light of the particular constitutional rights at stake in the relevant category of public services." *Association for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005).

   Lavandeira maintains that the rights at stake in this action are her "rights as a victim" (Doc. 32 at 15–16) and her right to "confer with the SAO." (Doc. 32 at 17) Also, Lavandeira asserts that the state attorney retains an "obligation . . . to obtain information from" Lavandeira. (Doc. 32 at 16) However, Lavandeira expressly disavows asserting a right to "accessing government information." (Doc. 32 at 15) And more importantly, Lavandeira identifies neither a constitutional right corresponding to her "rights as a victim" nor a constitutional right to "confer with the SAO." Florida law conveys these rights, if at all,[4] and Section 960.001, Florida Statutes, expressly refuses to waive sovereign immunity for the enforcement of these rights. Florida Statute 960.001(5) ("Nothing in this section or in the

---

   [4] "The right to be heard protected under section 16(b) is not the right to be heard by the prosecutor, but the right to be heard by a judge." *Barnett v. Antonacci*, 122 So. 3d 400, 406 (Fla. 4th DCA 2013). Florida Statute 960.001 implements Section 16(b), Article I of the State Constitution.

guidelines adopted pursuant to this section shall be construed as creating a cause of action against the state or any of its agencies or political subdivisions.").

Further, Lavandeira fails to specify any authority elevating her alleged "rights" to "fundamental," much less "vital" rights. *Florida International*, 405 F.3d at 958; *Nat'l Ass'n of the Deaf v. Fla.*, 945 F.3d 1339, 1350 (11th Cir. 2020) (suggesting that "vital" rights might permit the abrogation of sovereign immunity). Although Lavandeira correctly observes that Congress may remedy "a somewhat broader swath of conduct" under Section 5 of the Fourteenth Amendment, *Kimel*, 528 U.S. at 81 (2000), "it is more difficult to establish abrogation where no fundamental right is at issue," *National Ass'n of the Deaf v. Fla.*, 945 F.3d at 1350, and Lavandeira identifies none.

The state attorney acknowledges that *Tennessee v. Lane* recognizes a constitutional right of access to the courts, but the state attorney argues that "none of the referenced rights extends so far as to create a right to meet with the SAO outside of judicial proceedings in order to obtain information about a pending criminal case." (Doc. 23 at 16) Lavandeira "asserts this is a distinction without a difference, and Plaintiff's rights as a victim fall under the protection of the Fourteenth Amendment, barring Defendants' sovereign immunity defense." (Doc. 32 at 15) In other words, Lavandeira regards the state attorney's construction of *Tennessee v. Lane* as too narrow, and according to Lavandeira, her "rights as a victim" entitle her "to a meaningful role in the" criminal trial. (Doc. 32 at 16)

Lavandeira's articulation of the rights that abrogate sovereign immunity is confused and incorrect.  A distinction with an immense difference exists between Lavandeira's invoking a constitutional right of access to the courts and her invoking an illusory right to obtain information about, and influence the prosecution of, a case in court.  The Constitution protects the former; state law, at most, protects the latter.  "Section 5 does not so broadly enlarge congressional authority."  *Garrett*, 531 U.S. at 374.

Finally, Lavandeira attempts to rely on *National Ass'n of the Deaf v. Fla.*, 945 F.3d 1339, 1350 (11th Cir. 2020), to defeat the state attorney's sovereign immunity defense.  Lavandeira's reliance on the case is misguided for two reasons.  First, *National Association of the Deaf* recognizes as "fundamental" the right asserted by the plaintiffs — the right to participate in the democratic process."  Second, *National Association of the Deaf* suggests that the law permits congressional abrogation of state sovereign immunity to remedy the violation of a right, such as the "vital" right to education, that is less than a "fundamental" right.  945 F.3d at 1350 (citing *Florida International*, 405 F.3d at 958).  Yet Lavandeira identifies no right warranting abrogation in this circumstance — fundamental, vital, important, or otherwise.  The Supreme Court regards "education [a]s perhaps the most important function of state and local governments."  *Brown v. Board of Ed. of Topeka*, 347 U.S. 483, 493 (1954); *see also* MICHAEL REBELL, FLUNKING DEMOCRACY: SCHOOLS, COURTS, AND CIVIC PARTICIPATION (2018) (casting education as one of the state's most vital purposes).  And, at least for now, the Eleventh Circuit characterizes the "right to participate

- 22 -

in the democratic process" as a fundamental right.  *Nat'l Ass'n of the Deaf v. Fla.*,

945 F.3d 1339, 1349 (11th Cir. 2020).  But no governing precedent recognizes

Lavandeira's tortuous, attenuated, and strained construction of the rights identified

in *Tennessee v. Lane*.  In sum, although Congress validly abrogated sovereign

immunity for certain claims under Title II, the state attorney remains entitled to

sovereign immunity for Lavandeira's damages claim.

   IV. Lavandeira's Standing to Sue the State Attorney

      Finally, the state attorney argues that "it is the state court's responsibility to

provide accommodations for judicial proceedings and not the SAO's."  (Doc. 23

at 22)  Therefore, according to the state attorney, Lavandeira "lacks standing to sue

the SAO for either declaratory or injunctive relief regarding the failure to provide

A[SL] interpreter services for judicial proceedings."  (Doc. 23 at 22)  "Because

Plaintiff is not likely to suffer harm at the hands of the SAO with respect to any

accommodations and services for judicial proceedings," reasons the state attorney,

"Plaintiff lacks standing to sue the SAO for the failure to provide ASL interpreters in

judicial proceedings."  (Doc. 23 at 23)

      In response, Lavandeira insists (1) that she needs a more developed record to

determine the extent and scope of the defendants' discrimination; (2) that the state

attorney's office will need to provide an interpreter "[s]hould [she] need the service of

assisting to secure an interpreter, due to any failing by the 13th Judicial Court";

and (3) that her "claim for injunctive and declaratory relief is predicated on the

Defendants' practice of consistently failing to provide the service of securing interpreters."  (Doc. 32 at 20)

Rule 2.540, Florida Rules of Judicial Administration, obligates the Thirteenth Judicial Circuit to provide an interpreter in court.[5]  Lavandeira identifies no authority that obligates the state attorney to secure an interpreter for "judicial proceedings" and nothing in this action permits even the inference of the obligation (assuming for a moment that a mere inference would suffice).  Section 960.001, Florida Statutes, obligates the state attorney to "develop and implement guidelines" for assisting the victims of certain crimes, but Lavandeira alleges no fact permitting a reasonable inference of a "concrete" plan to employ the services of the state attorney, no allegation of a prospective injury that is "real" or "imminent," and no fact establishing that the state attorney must or can redress her injury.  Instead, Lavandeira alludes to "past incidents of discrimination" and vaguely asserts an unspecified right to receive assistance from the state attorney.  *Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir. 2001).  (Doc. 32 at 5, 20)  In sum, judged on the facts alleged

---

[5] The circuit court's obligation to secure an interpreter receives "judicial notice." *See Kuber v. Berkshire Life Ins. Co. of Am.*, 423 F. Supp. 3d 1326, 1331 (S.D. Fla. 2019) ("On a motion to dismiss, the court may take judicial notice of a fact outside of the pleading 'provided that it is central to the plaintiff's claims and is undisputed in terms of authenticity.'") (citing *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n. 3 (11th Cir. 2005)).

and hesitantly indulging the parties' notion of standing, Lavandeira enjoys no standing to sue the state attorney for injunctive or declaratory relief.[6]

## CONCLUSION

The state attorney's motion (Doc. 23) to dismiss is **GRANTED**.  The complaint, a "shotgun complaint," is **DISMISSED WITHOUT PREJUDICE**.  Also, the state attorney enjoys sovereign immunity, and on the facts alleged, Lavandeira enjoys no standing to state a claim for injunctive relief or declaratory relief against the state attorney.[7]  Accordingly, the "state attorney's office" and Andrew Warren (in his official capacity) are **DISMISSED**.

The City's motion (Doc. 13) to dismiss is **GRANTED-IN-PART**.  Although Lavandeira enjoys no standing to pursue a claim against the City for either injunctive relief or declaratory relief, she states a claim for damages.  Additionally, Lavandeira states a claim against the Thirteenth Judicial Circuit, and the Thirteenth Judicial Circuit's motion (Doc. 14) to dismiss is **DENIED**.

---

[6] This is not to say that no set of facts might establish standing for injunctive relief. *Leon v. Dugger*, 750 F. Supp. 1103, 1107 (M.D. Fla. 1990) ("[U]nder Florida law, both the prosecution and the court must consider the views of the victim or the victim's family (in a homicide), among other factors, in determining whether to accept a plea.") (quoting Rule 3.171(b)(1)(ii), Florida Rules of Criminal Procedure; Florida Statute §§ 921.143(3), 960.001(1)(e). But a district court "should not speculate concerning the existence of standing, nor . . . imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none. . . . If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006)

[7] Again, this order indulges the parties' notion that "standing" is the question. I doubt that, but the result is the same whether "standing" rubric is employed or whether the more correct notion of "failure to state a claim" is employed. This confusion appears among both bench and bar, and as a result clarity suffers and confusion prospers.

No later than **NOVEMBER 27, 2020**, Lavandeira may amend the complaint in accord with this order.  If she amends the complaint, Lavandeira (1) must specify against which defendant she directs each claim and (2) must delineate the facts that support each claim.  To this end, Lavandeira is encouraged to specify (1) from whom she requested an accommodation and (2) the defendant that she alleges denied her request.  Also, Lavandeira is encouraged to separate each claim into separate counts, and Lavandeira must assert her claims against the proper defendants.  Lavandeira must properly name the parties (that is, no more claims against an "office," a "courthouse," or the like).

ORDERED in Tampa, Florida, on November 6, 2020.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE