UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OLGA LAVANDEIRA,

     Plaintiff,

v.                                     CASE NO. 8:20-cv-169-T-23CPT

TAMPA POLICE DEPARTMENT, et al.,

     Defendants.

_____/

**ORDER**

After a November 6, 2020 order dismissed the complaint without prejudice, Olga Lavandeira amends (Doc. 46) the complaint and alleges that the defendants failed to provide her with an American Sign Language (ASL) interpreter during hearings and out-of-court meetings.  The state attorney moves (Doc. 52) to dismiss the amended complaint, the plaintiff opposes (Doc. 66) dismissal, and the state attorney replies (Doc. 72).

**BACKGROUND**

Lavandeira is the deaf mother of Monica Hoffa, murdered allegedly by the "Seminole Heights Killer."  On November 28, 2017, the Tampa Police Department (TPD) arrested Howell Donaldson III and charged him with four counts of murder, including the murder of Lavandeira's daughter.  Soon after Donaldson's arrest, a representative from the Victim Assistance Program (VAP), a service of the state

attorney, sent a text message to Lavandeira to notify her about Donaldson's first appearance in the Thirteenth Judicial Circuit.

Lavandeira alleges that, although she requested an ASL interpreter for Donaldson's first appearance, her request was denied. And she alleges that during later meetings, hearings, and services provided by the state attorney, she received no interpretive services despite repeated requests. Also, even though Florida law obligates the Thirteenth Judicial Circuit to provide an interpreter in the courtroom, Lavandeira alleges that she "is still being required to go through the VAP office to request services." (Doc. 46 at 22) Accordingly, Lavandeira alleges that the state attorney violated, and continues to violate, Section 504 of the Rehabilitation Act by refusing to furnish her with an interpreter and, consequently, by denying her equal access to the services provided by the state attorney.

## DISCUSSION

Moving (Doc. 52) to dismiss, the state attorney argues (1) that Lavandeira fails to state a claim under Section 504, (2) that sovereign immunity bars Lavandeira's damages claim, and (3) that Lavandeira enjoys no standing to assert a claim for declaratory and injunctive relief. Opposing (Doc. 66) dismissal, Lavandeira argues (1) that she states a claim under Section 504, (2) that the state attorney's receipt of federal financial assistance defeats sovereign immunity, and (3) that she enjoys standing. The state attorney replies (Doc. 72) and argues that his office receives no

federal financial assistance and that the response impermissibly cites information outside the record.

Although somewhat disorganized, the papers argue (1) whether the Eleventh Amendment entitles the state attorney to sovereign immunity from a claim for damages under the Rehabilitation Act, (2) whether Lavandeira enjoys standing to assert a claim for injunctive and declaratory relief against the state attorney, and (3) whether Lavandeira states a claim under Section 504 of the Rehabilitation Act. Two jurisdictional issues — whether the state attorney receives federal financial assistance and whether Lavandeira amply demonstrates a likelihood of a concrete and particularized injury — require preliminary attention before considering Lavandeira's alleged failure to state a claim. *R&R Int'l Consulting LLC v. Banco do Brasil, S.A.*, 981 F.3d 1239, 1244–45 (11th Cir. 2020) ("Whether jurisdiction exists is a separate question from whether a complaint states a claim upon which relief can be granted."); *Gardner v. Mutz*, 962 F.3d 1329, 1336, 1338–39 (11th Cir. 2020) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting.") (*quoting Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998)).

## *I. Sovereign Immunity*

The state attorney asserts that sovereign immunity precludes Lavandeira's Section 504 claim. Lavandeira, by contrast, insists that her allegations of

discrimination "fall squarely under Section 504, and the state waived its sovereign immunity upon receipt of federal financial assistance." (Doc. 66 at 8–9)  The crux of the parties' dispute is whether the state attorney receives federal financial assistance.

In support of sovereign immunity's barring the damages claim, the state attorney argues that the cited authority, considered in light of the amended complaint, establishes (1) that the state attorney violated no constitutional rights protected by the Fourteenth Amendment and (2) that the November 6 order's sovereign-immunity determination for Lavandeira's ADA claim "should also be binding on [Lavandeira's] RA claims." (Doc. 52 at 11); *see also* (Doc. 52 at 13)  The state attorney advances several arguments — occupying substantial portions of the motion to dismiss — about whether "legislation under [S]ection 5 . . . [is] congruent and proportional" to the injuries Congress sought to redress. (Doc. 52 at 14)  Finally, the state attorney contests Lavandeira's assertion that his office receives federal financial assistance.

Lavandeira's response focuses on the state attorney's receipt of financial assistance (albeit sometimes "indirectly") from the federal government. (Doc. 66 at 3)  First, Lavandeira notes that the state attorney "has approximately 300 employees," including assistants, investigators, paralegals, and administrative personnel.  And because the state receives federal financial assistance, Lavandeira argues that the state attorney benefits from the state and the state's extensive "employment infrastructure." (Doc. 66 at 4)

- 4 -

Next, Lavandeira asserts that the state attorney "receives a wide variety of in-kind federal funding," and Lavandeira cites several ostensible sources. (Doc. 66 at 5) For example, Lavandeira observes that the state attorney "is primarily housed, without charge," in the courthouse, which "receive[s] federal funding." (Doc. 66 at 5) And Lavandeira alleges several means by which the state attorney acts in concert with Hillsborough County, which receives federal financial assistance. Thus, according to Lavandeira, "[t]he SAO/VAP sufficiently meets the threshold as a recipient of federal funding, and in-kind federal assistance," and the state attorney is "covered by the statute." (Doc. 66 at 4, 6) At the very least, Lavandeira insists that she "is entitled to discovery on that issue." (Doc. 66 at 7)

The state attorney misunderstands (or at least misstates) several critical features of sovereign immunity, such as the difference between sovereign immunity under the Rehabilitation Act and the ADA. *Levy v. Kansas Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168–71 (10th Cir. 2015) (describing the distinctions between sovereign immunity under the ADA and sovereign immunity under the Rehabilitation Act). For instance, the state attorney argues that he enjoys sovereign immunity because the Rehabilitation Act "is substantially similar to the ADA" (Doc. 52 at 12), and he reiterates this argument several times throughout the motion to dismiss. (For example, Doc. 52 at 7, 11, 19)

But under the Rehabilitation Act a state waives sovereign immunity if the state receives "federal financial assistance." 42 U.S.C. § 2000d-7; *Nat'l Ass'n of the Deaf v.*

- 5 -

*Fla.*, 980 F.3d 763, 774 (11th Cir. 2020) (*citing Garrett v. Univ. of Ala. Birmingham Bd. of Trs.*, 344 F.3d 1288, 1290–91 (11th Cir. 2003)).  By contrast, the ADA precludes sovereign immunity if Title II, as applied to the rights implicated by Lavandeira's putative discrimination, "is an appropriate response to th[e] history and pattern of unequal treatment" for deaf people.  *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957 (11th Cir. 2005).[1]  Despite this distinction, the state attorney seems to argue that the November 6 order's findings — first, that Lavandeira enjoys no entitlement to prospective relief and, second, that the state attorney is entitled to sovereign immunity on Lavandeira's ADA claim — preclude a claim for damages under the Rehabilitation Act.

The state attorney correctly recounts the November 6 order's conclusion that the complaint establishes neither an imminent injury nor a right warranting abrogation of sovereign immunity by force of the ADA.  However, nothing in the November 6 order resolves whether the Eleventh Amendment entitles the state attorney to sovereign immunity from a damages claim under the Rehabilitation Act.

---

[1] In other words, Title II, considered "in the context" of this action, must exhibit "congruence and proportionality between the injury to be prevented . . . and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Determining whether Title II's abrogation of sovereign immunity is "congruent and proportional" requires examining (1) which right Congress aimed to "enforce" when enacting the ADA, (2) "whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary," and (3) "whether Title II is an appropriate response to this history and pattern of unequal treatment." *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957 (11th Cir. 2005). The November 6 order analyzes this issue at length. (Doc. 42 at 17–23)

*See McMannes v. Wisconsin Dep't of Workforce Dev.*, 2019 WL 95637, at *2 (W.D. Wis. 2019) (discussing the differences between the ADA and the Rehabilitation Act).

Because the Rehabilitation Act abrogates sovereign immunity under the auspices of "Congress's Spending Clause power," *Grayson v. Ivey*, 2020 WL 4201194, at *3 (M.D. Ga. 2020), the state attorney's entitlement to sovereign immunity depends on the sources of financial assistance to his office. The state attorney argues that his office "does not receive federal funds," a fact to which the state attorney attests under oath. (Doc. 52 at 12) However, the state attorney requests "leave to limit discovery to that narrow issue for [Lavandeira] if needed." (Doc. 52 at 13) In support of limiting discovery, the state attorney discusses *National Association of the Deaf v. Fla.*, 980 F.3d 763 (11th Cir. 2020), in which several deaf plaintiffs alleged that Florida government entities violated Section 504 by refusing to provide captioning for live and recorded legislative sessions.

Arguing that the defendants denied the plaintiffs the "opportunity to meaningfully participate in the democratic process," the plaintiffs sought money damages, declaratory relief, and injunctive relief. *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d at 769. Asserting the absence of any federal financial assistance, the Florida "legislative defendants" attempted to invoke sovereign immunity to bar the plaintiffs' Rehabilitation Act clam. Nonetheless, the district court denied the legislative defendants' motion to dismiss on the basis of sovereign immunity because (1) the evidence before the court was negligible, (2) the plaintiffs "proffered multiple

leads suggesting the Legislative Defendants receive indirect federal financial assistance," and (3) discovery constituted the plaintiffs' only opportunity to obtain information about funding.  The legislative defendants appealed, but the circuit court found that limited discovery on the issue of federal funding was within the district court's discretion.  *National Association of the Deaf v. Fla.*, 980 F.3d 763 (11th Cir. 2020).

The shift of attention to federal financial assistance presents a closer question about sovereign immunity, and a conclusive determination is premature without a more complete record.  Although Lavandeira states in her motion for summary judgment that the parties "have briefed the receipt of federal funding, and are awaiting an order" (Doc. 78 at 21), an insufficient record exists to identify or exclude any federal source of financial assistance to the state attorney.  The only submission by the state attorney on this issue is the state attorney's insistence in an interrogatory response (Doc. 72-2 at 2, 4) that he receives no "funding" from the federal government.  And, without the benefit of developed discovery, Lavandeira appends to her motion documents that ostensibly support her "leads suggesting the [state attorney] receive[s] this type of aid."  (*See* Docs. 72-1, 72-2); *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d at 775.  Therefore, the sources of financial assistance to the state attorney's office — and, consequently, the application of sovereign immunity to Lavandeira's damages claim — remains shrouded and unsubstantiated.

## *II. Lavandeira's Standing*

In addition to the state attorney's sovereign immunity contentions, the state attorney raises a jurisdictional challenge through the prism of Article III standing. To this end, the state attorney argues that "for proceedings provided by the courts, it is the court, and not the SAO, which is responsible for provision of accommodations."[2] (Doc. 52 at 4) According to the state attorney, therefore, the only actionable claim against the state attorney pertains to auxiliary services withheld "for non-court meetings." (Doc. 52 at 5) And for non-court meetings, the state attorney argues that Lavandeira "offers no allegations to support any reasonable inference that she will suffer 'future injury' at all" by the state attorney. (Doc. 52 at 18) Thus, the state attorney argues that Lavandeira lacks standing to sue him for injunctive and declaratory relief.

For her part, Lavandeira maintains that she has standing to assert a claim for injunctive and declaratory relief. She observes that "one service provided by the VAP is to secure interpreters if needed," and she argues that the state attorney accordingly holds "a concurrent obligation to ensure Ms. Lavandeira is accommodated in court hearings." (Doc. 66 at 17) And according to Lavandeira, she "has been advised she must make her interpreting request through the SAO for

---

[2] And the state attorney notes that Rule 2.540(f), Florida Rules of Judicial Administration, requires each court to establish "grievance procedures so that persons requesting accommodations may file complaints alleging discrimination [o]n the basis of disability in the provision of services." (Doc. 52 at 5)

court hearings," which process exposes her to future discrimination from the state attorney if his office fails to assist in acquiring interpretive services.  (Doc. 66 at 20)

Also, Lavandeira argues that the state attorney conducted "post hearing meetings . . . to explain what happened during the hearing[s]." (Doc. 66 at 19) These "post hearing meetings" allegedly occurred outside the courtroom, and the state attorney allegedly failed to provide an interpreter during the meetings.  Further, Lavandeira states that she "will have increased contact with the SAO/VAP prior to and during the trial about Monica's murder, because according to Andrew Warren they help victims navigate through the process." (Doc. 66 at 17)  In other words, Lavandeira argues that her allegations show that she will receive discriminatory treatment by the state attorney for future court hearings and for "non-court meetings."

This order studiedly — but reluctantly — applies the parties' notion of standing, which includes "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."  *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006) (*citing Barrows v. Jackson*, 346 U.S. 249, 255–56 (1953)).  The "prudential" requirements for standing, including the prohibition against a plaintiff's raising the claim of a third party, require distinction from the "constitutional" requirements for standing (analyzed according to the Supreme Court's perennial standing triad of injury-in-fact, traceability, and redressability).

Lavandeira must establish constitutional standing "on a claim-by-claim basis." *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015); *Gardner v. Mutz*, 962 F.3d 1329, 1343 (11th Cir. 2020) (conducting a separate standing analysis for each claim asserted); *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1288 (11th Cir. 2001) ("[A] plaintiff cannot pursue an individual claim unless he proves standing."). Thus, if Lavandeira enjoys standing to assert a claim for damages but cannot otherwise establish a likelihood of future injury, she enjoys no standing to sue for injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (allowing a claim for damages but not a claim for injunctive relief); *Snyder v. Green Roads of Fla. LLC*, 430 F. Supp. 3d 1297, 1303 (S.D. Fla. 2020) (analyzing separately the plaintiff's standing for a damages claim and the plaintiff's standing for a claim requesting injunctive relief).[3]

Citing the Thirteenth Judicial Circuit's obligation to secure an interpreter under Rule 2.540, Florida Rules of Judicial Administration, the November 6 order explains that Lavandeira lacks standing because the complaint fails to allege facts establishing a "concrete" or "imminent" injury that is "traceable" to, and "redressable" by, the state attorney. (Doc. 42 at 24) However, the order also explains, "[t]his is not to say that no set of facts might establish standing for

---

[3] "Nor does [Lavandeira, if she] has been subject to injurious conduct of one kind[,] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which [s]he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) (*citing Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972)).

injunctive relief."  (Doc. 42 at 25, n. 6)  Hence, Lavandeira has standing only if the amended complaint includes additional facts that demonstrate the likelihood of an imminent injury that is traceable to the state attorney.

The amended complaint includes allegations that the "VAP is mandated to assist victims, help them navigate through judicial proceedings, and arrange for translators if needed."  (Doc. 42 at 12)  Even though Rule 2.540, Florida Rules of Judicial Administration, confirms the judicial circuit's obligation to provide an interpreter during courtroom proceedings, Lavandeira alleges facts tending to show that securing an interpreter requires concerted effort between the judicial circuit and the state attorney.  (For example, Doc. 42 at 18) ("The ADA Office of the Thirteen[th] Judicial Circuit . . . told [Lavandeira's wife] requests for ASL interpreters for the Donaldson case must come from the attorney's office, not from them.").  And according to Lavandeira, the state attorney denied interpreter requests not because the state attorney shared no responsibility for providing an interpreter but because the hearings would be "short."  (Doc. 42 at 17, 19–21)

Courtroom hearings aside, Lavandeira also alleges that the state attorney and his staff "would meet with the victims' families, either in the hallway of the courthouse or in their office, to talk further about the court hearing."  (Doc. 46 at 14)  Several of these meetings allegedly occurred outside the courthouse, and Lavandeira alleges that the state attorney has established during these meetings a pattern of discriminatory conduct that indicates a concrete injury.  "While past wrongs do not

- 12 -

in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy, [a] plaintiff's exposure to illegal conduct in the past is nonetheless evidence bearing on whether there is a real and immediate threat of repeated injury." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336 (11th Cir. 2013) (internal quotations and citations omitted).  In other words, the state attorney's past conduct is prologue to a "real and immediate threat of repeated injury."

Further, Lavandeira alleges that the state attorney continues to provide services to which she will lack equal access.  That is, according to Lavandeira, an imminent injury looms (1) because the state attorney provided no interpreter for the private meetings, (2) because she "continues to receive services from the VAP/SAO," and (3) because she "shall continue to require the services" of the state attorney.  (Doc. 46 at 22)  And unlike the initial complaint, Lavandeira supports her allegations with facts about her future contact with the state attorney, such as her provision of an "impact statement" and her "attend[ing] future meetings called by the VAP/SAO."  (Doc. 46 at 22)

In sum, the governing authority and the present allegations confirm Lavandeira's standing in this instance.  Lavandeira alleges several instances of the state attorney's failing to provide her with services to which the Rehabilitation Act entitles her, and she alleges a reasonable need for those services in the future.  Thus, Lavandeira's allegations — considered separately, but especially together — establish

that Lavandeira initially satisfies the requirements for standing to sue for prospective relief under the Rehabilitation Act.

### III. Ex Parte Young

For similar reasons, *Ex parte Young*, 209 U.S. 123 (1908), entitles Lavandeira to pursue prospective relief for the state attorney's allegedly ongoing violations of Lavandeira's federal right to receive services "on an equal footing." *Kornblau v. Dade Cty.*, 86 F.3d 193, 194 (11th Cir. 1996). Relying on *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the state attorney argues that Lavandeira "does not have [under *Ex parte Young*] a claim for prospective relief" against the state attorney. Hence, according to the state attorney, "[s]ince [Lavandeira] does not plead a constitutional violation as to the SAO, her claims for damages and for prospective relief must be dismissed, based on Eleventh Amendment immunity." (Doc. 52 at 16) By contrast, Lavandeira maintains that *Ex parte Young* entitles her to proceed with her prospective claims against the state attorney. Lavandeira argues that "there shall be post court meetings with the SAO, and in the event they do not happen at the courthouse Ms. Lavandeira shall face future discrimination." (Doc. 66 at 17) And citing authority interpreting *Ex parte Young*, Lavandeira remarks that the state attorney relies on inapposite authority about "[sovereign] immunity when a state official was named in his individual capacity, not his official capacity." (Doc. 66 at 17)

*Ex parte Young* establishes an exception to sovereign immunity "for suits against state officers seeking *prospective* equitable relief to end *continuing* violations of

- 14 -

federal law." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (emphasis in original).  In other words, *Ex parte Young* permits a plaintiff to pursue injunctive relief against a state official's action (or, in this circumstance, inaction) that constitutes an ongoing violation of federal law.  *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction.").  But *Ex parte Young* has yielded to exceptions, such as an action "which implicates special sovereignty interests"[4] or an action alleging "that a state official has violated *state* law."[5]  If one of these exceptions applies, a state official's sovereign immunity remains.

The state attorney attempts to invoke exceptions to *Ex parte Young* by citing putatively relevant authority and by advancing a vague notion of "sovereignty interests."  Although the state attorney correctly observes that "*Ex parte Young* is not a magical talisman for plaintiffs seeking prospective equitable relief against a State's official" (Doc. 52 at 16), the application of *Ex parte Young* is relatively "straightforward," especially in this instance.  *Verizon Maryland, Inc. v. Public Service Comm. of Maryland*, 535 U.S. 635, 645 (2002).

---

[4] *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) (denying the application of *Ex parte Young* in a quiet title action).

[5] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 90 (1984) (denying the application of *Ex parte Young* because the plaintiff alleged that the state official violated state, not federal, law).

- 15 -

Lavandeira alleges the state attorney's ongoing failure to provide her with an interpreter, a service to which she claims an entitlement under the Rehabilitation Act, and she requests declaratory and injunctive relief from this alleged failure. *Ex parte Young* is not without limitation and exception, but the state attorney identifies neither a "special sovereignty interest" nor any other applicable limitation to *Ex parte Young* that warrants barring Lavandeira's claim for injunctive relief, which falls squarely under *Ex parte Young*. Lavandeira's claims avoid the bar of sovereign immunity.

### *IV. Whether Lavandeira States a Claim Under the Rehabilitation Act*

Finally, the state attorney argues that Lavandeira fails to state a claim under the Rehabilitation Act. Six arguments animate the state attorney's motion, some of which duplicate his jurisdictional arguments. First, the state attorney argues that the Rehabilitation Act "imposes a stricter causation standard than the ADA." (Doc. 52 at 7) Second, because the November 6 order holds that the state attorney "is immune from claims under the ADA," the state attorney insists that "this finding . . . should be binding as to any RA claims" against the state attorney. (Doc. 52 at 7) Third, the state attorney argues that the "SAO does not receive federal funds." (Doc. 52 at 7) Fourth, the state attorney argues that Lavandeira's access to the state attorney's services is immaterial because he "would continue to prosecute the case whether or not [Lavandeira] decided to attend hearings or request information from" the state attorney. (Doc. 52 at 8) Fifth, the state attorney argues that Lavandeira

fails to allege the "discriminatory intent" required to establish a damages claim under the Rehabilitation Act. (Doc. 52 at 8) And sixth, the state attorney argues that Lavandeira "was not excluded or denied participat[ion] in meetings" and that Lavandeira enjoys "no constitutional right . . . to receive information from the SAO."[6] (Doc. 52 at 8) For these reasons, among others, the state attorney insists that Lavandeira cannot sustain a claim under the Rehabilitation Act.

Insisting that she states a claim under the Rehabilitation Act, Lavandeira observes that "the Court has already held Plaintiff has stated a claim under the Rehabilitation Act." (Doc. 66 at 7) Also, Lavandeira argues that Section 504 requires the state attorney to provide meaningful access to the office's services and that "Section 504 is not limited to conduct which violates the Constitution." (Doc. 66 at 8) Next, Lavandeira argues that her niece, Yurian Gutierrez, could not adequately translate for Lavandeira, and Lavandeira argues that the state attorney's office knew that "Gutierrez was not a qualified interpreter." (Doc. 66 at 10) Because Gutierrez lacked the ability to adequately interpret and because the state attorney's office failed to provide an interpreter, Lavandeira contends that she "was denied services based on her disability." (Doc. 66 at 11)

---

[6] Also, the state attorney argues that Lavandeira's inability during meetings with the state attorney's office to "obtain detailed information about the prosecution of her deceased daughter's case, does not implicate conduct which actually violates the U.S. Constitution." (Doc. 52 at 11) Further, the state attorney argues that the victim's rights law under Section 960.001, Florida Statutes, creates no "constitutional right to obtain information." (Doc. 52 at 12) The state attorney advances these arguments in a separate section, and the arguments somewhat confuse jurisdictional and substantive issues.

Further, Lavandeira notes that, even if the provision of an interpreter falls entirely within the purview of the Thirteenth Judicial Circuit, the amended complaint includes allegations that the state attorney held "additional meetings after the court hearings." (Doc. 66 at 11)  And Lavandeira recounts several other instances in which the state attorney allegedly failed to provide access to services by refusing to furnish an interpreter.  (Doc. 66 at 11–14, 19)  Citing these instances, Lavandeira contends that the state attorney cannot reasonably argue that she "was not excluded or denied participat[ion] in meetings with the SAO." (Doc. 52 at 8)  Last, Lavandeira argues that JoCarrol Bird, a representative of the state attorney with "full authority to request an interpreter," acted with "deliberate indifference" in denying Lavandeira's requests for interpretive services.  (Doc. 66 at 14)

The November 6 order explains that Lavandeira's allegations, which the amended complaint encompasses, "permit a plausible inference that the state attorney failed to afford Lavandeira . . . an 'equal opportunity' to receive the benefits of the meetings by denying her request for an interpreter." (Doc. 42 at 17)  Also, the amended complaint contains sufficient facts (Doc. 46 at 13–16) demonstrating "deliberate indifference." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012).  Although the November 6 order dismisses the ADA claim against the state attorney for other reasons, the conclusion remains: Lavandeira states a claim for past violation of Section 504 because she alleges that the state attorney failed to furnish an interpreter during meetings and services.

- 18 -

## CONCLUSION

The factual record — evaluated on a motion to dismiss without the benefit of discovery — remains insufficient to conclusively determine whether sovereign immunity bars Lavandeira's claim under the Rehabilitation Act. The issue apparently depends on whether the state attorney receives "financial assistance" from the federal government.  That issue is deferred for later determination.  The balance of the state attorney's motion to dismiss (Doc. 52) is **DENIED**.

ORDERED in Tampa, Florida, on April 20, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE