UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OLGA LAVANDEIRA,

    Plaintiff,

v.                                                  Case No. 8:20-cv-169-CPT

CITY OF TAMPA,

    Defendant.
_____/

**O R D E R**

Before the Court are Plaintiff Olga Lavandeira's ore tenus motion for judgment as a matter of law (Doc. 187), and her renewed motion for a judgement as a matter of law, or, alternatively, for a new trial pursuant to Federal Rules of Civil Procedure 50 and 59 (Doc. 207). After careful review and with the benefit of oral argument (Docs. 213, 214), as well as supplemental briefings from the parties (Docs. 218, 219, 220), Lavandeira's motions are denied.

I.

This case stems from the tragic murder of Monica Hoffa in 2017 by Howell Donaldson in the Seminole Heights area of Tampa, Florida.[1] (Doc. 144 at 11). Hoffa

---

[1] Nothing in this decision should detract from the sympathy the Tampa community has for the senseless loss of Lavandeira's child.

was one of several victims killed by Donaldson, who came to be known as the Seminole Heights Serial Killer. *Id.* at 2. Hoffa was the only daughter of Lavandeira, who is deaf and uses American Sign Language (ASL) to communicate. *Id.* at 2, 11.

As result of Hoffa's death, Lavandeira had several interactions with the Tampa Police Department (TPD), some of which were in person. These consisted of, *inter alia*, an October 20, 2017, visit to the TPD that Lavandeira made with one of her nieces, Ivette Corvo, to collect Hoffa's belongings; a November 28, 2017, press conference where the TPD announced Donaldson's arrest, which Lavandeira watched but did not attend and which involved the use of a "fake interpreter;" a November 30, 2017, meeting Lavandeira and multiple members of her family, including another niece, Yurian Gutierrez, and Gutierrez's husband, Carlos, had with a lead detective, Austin Hill, on the Donaldson case;[2] and a December 1, 2017, press conference where the TPD honored the individual who provided information leading to Donaldson's arrest, which Lavandeira did attend. *Id.* at 11–13; (Doc. 190 at 7–9); *see* (Doc. 198 at 17); (Doc. 200 at 31–32).

In light of these events and other circumstances, Lavandeira initiated the instant lawsuit against the TPD, its chief of police, the Thirteenth Judicial Circuit Courthouse, the Office of the State Attorney, the Thirteenth Judicial Circuit, and the State Attorney for the Thirteenth Judicial Circuit. (Doc. 1). Upon the Defendants' motions (Docs. 13, 14, 23), the Court dismissed Lavandeira's complaint without prejudice as a

---

[2] This meeting was apparently not recorded or the subject of any reports. (Doc. 208 at 3).

"shotgun pleading." (Doc. 42). The Court also found that both the State Attorney's Office and the State Attorney were immune from suit and that the claims against the TPD and its police chief should have been brought against the City of Tampa (City). *Id*.

In a subsequent amended complaint, Lavandeira named as Defendants the City, the Thirteenth Judicial Circuit, and the State Attorney for the Thirteenth Judicial Circuit, and asserted claims for violations of Title II of the Americans with Disabilities Act (ADA), and section 504 of the Rehabilitation Act of 1973 (RA). (Doc. 46). In support of these claims, Lavandeira averred, among other things, that the "Defendants failed to provide effective communication, auxiliary aids and services, meaningful access, and denied [her] full and equal enjoyment of [the] Defendants' services, facilities, and privileges." *Id*. For relief, Lavandeira sought a declaratory judgment, a permanent injunction, monetary damages, and attorney's fees, costs, and expenses. *Id*.

Following discovery and a series of largely unsuccessful summary judgment motions (Docs. 77, 78, 80, 84, 97, 98),³ the case proceeded to trial solely against the City.⁴ During that trial, which lasted five days, the parties elicited testimony from multiple witnesses and introduced numerous exhibits. (Docs. 183, 184, 198, 199, 200,

---

³ The State Attorney was, however, awarded summary judgment on Lavandeira's RA claim on the basis of sovereign immunity. (Doc. 84, 98).
⁴ Lavandeira and the Thirteenth Judicial Circuit reached a settlement agreement in January 2021 (Doc. 62) and filed a joint stipulation dismissing the case against the Circuit. (Doc. 82). Lavandeira later elected to dismiss her case against the State Attorney as well. *See* (Docs. 116, 117); *see also Lavandeira v. Warren*, (Docs. 10, 18, 19), No. 8:21-cv-2690 (M.D. Fla. 2021).

201, 202, 204, 205, 206). Those witnesses included Lavandeira, Yurian and Carlos Gutierrez, Hill,[5] Shelina Reneau, Stephen Hegarty, Raquel Pancho, and Lavandeira's expert by the name of Dr. Judy Shepard-Kegl. (Docs. 198, 199, 200, 201, 202, 204, 205, 206). Counsel for both sides were well-prepared throughout the trial and represented their respective clients with the highest degree of professionalism.

As pertinent here, Lavandeira orally moved at the close of evidence for judgment as a matter of law pursuant to Rule 50(a). (Doc. 187). The Court reserved ruling on that motion. (Doc. 216). After a period of deliberation, the jury returned a verdict in favor of the City (Doc. 191), and the Clerk of Court entered a judgment reflecting the jury's verdict several days later (Doc. 195).

Lavandeira's instant renewed motion for judgment as a matter of law or, alternatively, for a new trial followed. (Doc. 207). The Court heard oral argument on this motion, after which it directed the parties to supply supplemental briefing on two discrete issues. (Docs. 214, 217). The parties have since filed those submissions (Docs. 218, 219), and Lavandeira has additionally submitted a notice of supplemental authority (Doc. 220). Lavandeira's motions are now ripe for the Court's consideration.

---

[5] Hill's testimony was read into the record from his deposition transcript. (Doc. 144 at 10); (Doc. 161-1); (Doc. 207 at 12 n.6). Citations to Hill's testimony herein are to the pages of his deposition transcript, not to the CM/ECF generated page numbers.

II.

A.

The "renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a)," and "a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion." *U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 813 (11th Cir. 2015) (internal quotation marks and citations omitted). "Strict identity of issues" between the two motions is not required, but the grounds identified in a Rule 50(b) motion must be "closely related" to the grounds raised in the prior Rule 50(a) motion, such that opposing counsel and the court are on notice of the evidentiary shortcomings asserted. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010). This procedural safeguard ensures that "[t]he moving party cannot ambush the court and opposing counsel after the verdict when the only remedy is a completely new trial." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1245 (11th Cir. 2001).

In support of her Rule 50(a) motion following the close of evidence, Lavandeira asserted that sufficient evidence was adduced at trial to establish that the City excluded her on the basis of her disability on various occasions in violation of the ADA and the RA. (Doc. 203 at 3–5). Those instances include when she went to the TPD to get her daughter's belongings, at the meeting with Detective Hill, during the two press conferences held by TPD on the Seminole Heights serial killer investigation, and when the TPD contacted members of her family without reaching out to her. *Id.* at 3–4. She

also asserted she had tendered enough evidence to establish that she requested an interpreter from the TPD and that, in any event, it was obvious she required such assistance. *Id*. at 4–5. As for damages, she maintained that the evidence supported a finding that the TPD intentionally discriminated against her and that she had been both emotionally harmed by the discrimination and deprived of the opportunity to, *inter alia*, learn the details of the TPD's investigation of her daughter's murder. *Id*. at 4–5.

In her instant Rule 50(b) motion, Lavandeira raises the same issues that she alleged in her ore tenus Rule 50(a) motion. (Doc. 207). The City acknowledged as much at oral argument. *See* (Doc. 214). The Court may thus rule on both motions contemporaneously. *See Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1121 (11th Cir. 2016) ("'[T]hat Rule 50(b) uses the word "renewed" makes clear that a Rule 50(b) motion should be decided in the same way it would have been decided prior to the jury's verdict.'") (quoting *Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1363 (11th Cir. 2014)).

A Rule 50(b) motion for a judgment as a matter of law should only be granted if no objectively reasonable jury, based on the evidence and inferences adduced at trial and through the exercise of impartial judgment, could reach the verdict handed down by the jury. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997). Stated differently, the party seeking a judgment as a matter of law must establish that the trial evidence was "so overwhelmingly [in her favor] that a reasonable jury could not arrive at a contrary

verdict." *Middlebrooks*, 256 F.3d at 1246. A judgment as a matter of law is not warranted, however, where there is adequate evidence in the trial record that would allow reasonable minds to arrive at different conclusions. *E.E.O.C. v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018); *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010). In applying this test, a court must view "all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *E.E.O.C.*, 884 F.3d at 1329 (citation omitted). This means that while "the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). That is, a court should credit the evidence favoring the nonmovant and should only credit that "evidence supporting the moving party [which] is uncontradicted and unimpeached, at least to the extent that [such] evidence comes from disinterested witnesses." *Id.* (internal quotation marks and citation omitted). "Importantly, [a] court must not make credibility determinations or weigh evidence, as these are functions reserved for the jury." *Noel v. Terrace of St. Cloud, LLC*, 212 F. Supp. 3d 1193, 1198 (M.D. Fla. 2016).

The crux of Lavandeira's renewed motion—as noted—is that there is insufficient evidence to support the jury's verdict regarding her ADA and RA claims, and that she is entitled to both monetary and injunctive relief. (Doc. 207 at 2). Before addressing these claims, it is first necessary to review the governing legal principles.

To succeed on her ADA and RA counts, Lavandeira had to prove by a preponderance of the evidence that: (1) she is a qualified person with a disability; and

(2) the City excluded her from participating in its services, denied her the benefits of its services, or otherwise subjected her to discrimination solely because of her disability (i.e., her hearing impairment). *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007); *see* (Doc. 190 at 11). Lavandeira additionally had to demonstrate by a preponderance of the evidence for her RA claim that the City received federal funding during the relevant period. 29 U.S.C. § 794; *Paez v. Fla. Dep't of Health*, 2021 WL 3015282, at *2 (M.D. Fla. Apr. 19, 2021); *see* (Doc. 190 at 11).

    Lavandeira and the City stipulated that Lavandeira was a qualified person with a disability under both the ADA and the RA. (Doc. 190 at 7). They also agreed that for purposes of the RA's third element, the City received federal financial assistance during the relevant period. *Id.* Accordingly, it was left for the jury to decide the remaining element shared by both Lavandeira's ADA and RA counts—that is, whether the City excluded her from participating in the City services, denied her the benefits of the City's services, or otherwise subjected her to discrimination solely based upon her hearing impairment. *See id.* at 11.

    To satisfy this element, Lavandeira had to show by a preponderance of evidence that the City failed to provide her with the auxiliary aids necessary for her to have an equal opportunity to take advantage of the City's services during the investigation of her daughter's murder. *Id.* at 13. The type of auxiliary aids necessary to afford effective communication can vary in accordance with the method of communication used by the hearing-impaired individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.

8

*See* 28 C.F.R. § 36.303(c)(1)(ii); (Doc. 190 at 13). In determining which auxiliary aids are necessary, a public entity like the City must give primary consideration to the requests of the hearing-impaired person. 28 C.F.R. § 35.160(b)(2); (Doc. 190 at 13). Primary consideration means that the City was required to honor Lavandeira's choice of a sign language interpreter unless the City could show by a preponderance of the evidence that another equally effective means of communication existed and was supplied to Lavandeira by the City. *See* 28 C.F.R. § 36.303; (Doc. 190 at 13).

To be effective, auxiliary aids must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the hearing-impaired individual. 28 C.F.R. § 36.303(c)(1)(ii); (Doc. 190 at 13). For the aids to be equally effective, however, it is not mandated that they produce the identical result for disabled and nondisabled persons. 45 C.F.R. § 84.4(b)(2); (Doc. 190 at 13). Instead, they must permit disabled persons the opportunity to gain the same benefit in the most integrated setting appropriate to the persons' needs. 45 C.F.R. § 84.4(b)(2); (Doc. 190 at 13–14).

That said, an individual who is deaf is not entitled to an on-site interpreter every time she asks for one. *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014); (Doc. 190 at 14). If effective communication under the circumstances is achievable with something less than an on-site interpreter, the City was well within its obligations under the ADA and the RA to rely on other alternatives. *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 836 (11th Cir. 2017); (Doc. 190 at 14).

9

A public entity like the City, however, cannot dictate that a hearing-impaired individual bring another individual to interpret for her. 28 C.F.R. § 36.303(c)(2); (Doc. 190 at 14). And a hearing-impaired individual is not compelled to request a reasonable modification if the need for the modification is obvious. *Schwarz v. Villages Charter Sch., Inc.*, 165 F. Supp. 1153, 1173 (M.D. Fla. 2016) (citing *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 2013 WL 1212860, at *4 (M.D. Fla. Mar. 25, 2013), *aff'd*, 768 F.3d 1135 (11th Cir. 2014)).[6]

Lavandeira maintains that the evidence showed the City excluded her because of her deafness given its failure to provide her with any auxiliary aids. (Doc. 207 at 5–6). To buttress this assertion, she avers that the City was not permitted to use her family members as ASL interpreters, that she demonstrated she requested an ASL interpreter on multiple occasions, and that her need for an aid was obvious in any event. *Id.* at 5–22. With respect to damages, Lavandeira additionally contends the evidence establishes that the TPD knew about her disability and that she suffered harm in the form of emotional distress and lost opportunity. *Id.* at 20–25.

The City counters that Lavandeira did not show that she actually requested auxiliary aids. (Doc. 208 at 3–5); *see also Schwarz v. Villages Charter Sch., Inc.*, 165 F. Supp. 1153, 1173 (M.D. Fla. 2016). The Eleventh Circuit has held in this respect that "the duty to provide a reasonable accommodation is not triggered unless a specific

---

[6] The Court recognizes that, in *McCullom*, the "obvious" need for an aid element was in the context of a plaintiff's entitlement to compensatory damages, which necessitates a showing that the defendant engaged in intentional discrimination. 768 F.3d at 1146–47.

demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999); *see also Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009) (citing *Gaston* for the same proposition).

Here, Hill testified that no request was made for a sign language interpreter when he received a call about Lavandeira's desire to pick up Hoffa's items at the police station. (Doc. 160-1 at 44).[7] The main, if not only, evidence tendered by Lavandeira to show that she did, in fact, ask for an interpreter was her own testimony. (Doc. 200 at 19–20); (Doc. 207 at 12–14). The jurors were free to credit or not to credit Lavandeira's testimony on this matter, just as they were free to do so for any other testimony. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *Cornell v. CF Ctr., LLC*, 410 F. App'x 265, 268 (11th Cir. 2011) (finding that it was the jury's role to assess the credibility of witness testimony that contradicted some of the plaintiff's claims); *Noel*, 212 F. Supp. 3d at 1198 (noting that "credibility determinations" and the "weigh[ing of] evidence . . . are functions reserved for the jury"). This is especially true since Lavandeira was hardly a disinterested witness. In short, construing the testimony and exhibits in a light most favorable to the City, the

---

[7] Hill was not present when Lavandeira and Corvo collected Hoffa's personal effects. (Doc. 160-1 at 39); (Doc. 207 at 12). That task was instead handled by a TPD property clerk who was not involved with the Donaldson investigation. (Doc. 160-1 at 43–49); (Doc. 207 at 11–14); (Doc. 214).

11

evidence was not "so overwhelmingly [in Lavandeira's favor on this issue] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks*, 256 F.3d at 1246.

As for the later meeting at TPD about the investigation, Hill testified that he was unaware that Lavandeira would be attending the meeting and that he had not been asked to secure an interpreter in advance. (Doc. 160-1 at 65, 78). While there was evidence introduced at the trial that an interpreter was requested during the meeting, including through Lavandeira's physical contact with Hill (Doc. 198 at 20–22); (Doc. 199 at 5–9, 38); (Doc. 201 at 18–19); (Doc. 207 at 8, 14–17), Hill testified that he did not recall Lavandeira touching him or otherwise indicating to him that she needed an interpreter. (Doc. 160-1 at 69–70, 72, 75). Again, construing the evidence and inferences in a light most favorable to the City, the Court cannot find that the evidence was so "overwhelmingly" in Lavandeira's favor on this aspect of her case "that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks*, 256 F.3d at 1246.

Concerning the two press conferences, Lavandeira did not offer sufficient evidence that she sought an interpreter for these incidents either. Hill was only informed that she would be attending the press conference where the individual was rewarded for alerting law enforcement to Hoffa's killer. (Doc. 199 at 17). And Lavandeira did not even attend the press conference in which Donaldson's arrest was announced. (Doc. 200 at 30–32). She merely watched it on her phone. *Id.*

Lavandeira's next assertion that it was obvious that she needed an auxiliary aid is likewise unavailing. In all the instances Lavandeira cites, she was accompanied by

12

family members who acted as interpreters for her. Although Lavandeira points to testimony to support her position that she and her family made it clear she needed an interpreter (Doc. 207 at 11–20), it was up to the jury to evaluate that evidence and to accept it or reject it as it saw fit. *Cleveland*, 369 F.3d at 1192–93; *Cornell*, 410 F. App'x at 268; *Noel*, 212 F. Supp. 3d at 1198. Again, as with Lavandeira's other challenges, the evidence on this question was not "so overwhelmingly [in her favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks*, 256 F.3d at 1246.

Nor is the Court persuaded by Lavandeira's reliance on the governing regulations, which prohibit a public entity from compelling "an individual with a disability to bring another individual to interpret for . . . her." 28 C.F.R. § 35.160(c)(1); (Doc. 207 at 7–11). To begin, those regulations authorize the use of a family member "[w]here the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances." *Id.* § 35.160(c)(2). Construing the evidence and the attendant inferences in a light most favorable to the City, the jury could reasonably have found these conditions to be met here. *Noel*, 212 F. Supp. 3d at 1198 (noting that where "there is substantial evidence in the trial record which would allow reasonable minds to reach different conclusions, judgment as a matter of law is inappropriate"); *see Mee Indus.*, 608 F.3d at 1211. At a minimum, as with Lavandeira's other claims, the evidence pertaining to this aspect of her case was not "so overwhelmingly [in her favor]

that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks*, 256 F.3d at 1246.[8]

Lavandeira also takes issue with the TPD's purported use of other individuals as "conduits" to transmit information to her about Hoffa's death. (Doc. 207 at 20). The gist of this claim is that Lavandeira was relegated to receiving details about the investigation through third parties, such as her daughter's father, Ken Hoffa, who—according to evidence adduced at trial—communicated with the TPD at various times. (Doc. 144 at 12); (Doc. 190 at 8); (Doc. 207 at 20). The Court finds this claim unavailing as well. In short, construing the evidence and inferences in a light most favorable to the City, the trial evidence is not "so overwhelmingly [in Lavandeira's favor on this issue] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks*, 256 F.3d at 1246.

Finally, Lavandeira contends that she was entitled to emotional distress and opportunity damages, as well as injunctive relief. (Doc. 207 at 22–25). This argument fails given the Court's conclusion that it will not overturn the jury's verdict in favor of the City on Lavandeira's ADA and RA claims.[9]

---

[8] In light of the above findings, the Court need not resolve the parties' dispute as to whether Lavandeira could read lips and whether the City can now be relieved of its stipulation that she could not. (Doc. 207 at 6); (Doc. 218 at 5–7); (Doc. 219 at 5–7). For purposes of its analysis, the Court assumes that the jury complied with the Court instructions that it "must treat . . . as proved" that Lavandeira "cannot lipread." (Doc. 190 at 7).

[9] The Court does not address whether, as a matter of law, Lavandeira could obtain emotional distress damages in light of the Supreme Court's decision in *Cummings v Premier Rehab Keller, PLLC*, 142 S. Ct 1562 (2022). (Doc. 207 at 22–25); (Doc. 218 at 2–5); (Doc. 219 at 3); (Doc. 220 at 1–2). Nor does it address whether, as a matter of law, she could obtain injunctive relief under the circumstances presented. (Doc. 207 at 22–25); (Doc. 218 at 2–5); (Doc. 219 at 3–5).

B.

Lavandeira requests in the alternative that the Court award her a new trial pursuant to Rule 59. (Doc. 207). A court may issue such relief "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). In considering the propriety of a new trial, a court must determine if "the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (internal quotation marks and citations omitted). To ensure that jurists do not simply substitute their judgments for those of juries, the Eleventh Circuit has cautioned "that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* (citations omitted). Unlike with a renewed motion for judgment as a matter of law, however, judges faced with a request for a new trial are "free to weigh the evidence . . . and must view both the evidence favoring the jury verdict and the evidence in favor of the moving party." *Meidling v. Walgreen Co.*, 2015 WL 12838339, at *3 (M.D. Fla. Apr. 20, 2015) (citing *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982)).

In the end, a court deciding a motion for a new trial must balance its "traditional equity power to prevent injustice" with its "duty to guard the integrity and fairness of the proceedings." *Christopher v. Florida*, 449 F.3d 1360, 1366 n.4 (11th Cir. 2006). Accordingly, it should award a new trial "only where the error has caused

substantial prejudice to the affected party (or, stated somewhat differently, affected the party's substantial rights or resulted in substantial injustice)." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 807 (11th Cir. 2017) (internal quotation marks and citation omitted).

Having presided over the trial and having had the benefit of the parties' thorough post-trial submissions, the Court finds that the verdict was not against the great weight of the evidence. As a result, the Court will not upset the jury's verdict. *Williams*, 689 F.2d at 974 (noting that where a trial involved relatively straightforward issues, "highly disputed facts," and "an absence of 'pernicious occurrences,' trial courts should be considerably less inclined to disturb a jury verdict").

### III.

In light of all the above, it is hereby ORDERED:

1. Lavandeira's ore tenus motion for judgment as a matter of law (Doc. 187) is denied; and

2. Lavandeira's renewed motion for judgment as a matter of law, or in the alternative for a new trial (Doc. 207), is denied.

SO ORDERED in Tampa, Florida, this 28th day of March 2024.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record